# 13-3573-cv

## In the United States Court of Appeals for the Second Circuit

IN RE AUTOHOP LITIGATION

—

DISH NETWORK L.L.C.,

*Plaintiff-Consolidated Defendant-Counter Defendant-Appellee,*

v.

AMERICAN BROADCASTING COMPANIES, INC., ABC, INC., and DISNEY ENTERPRISES, INC.,

*Defendants-Counter Claimants-Appellants,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRIEF OF COUNTERCLAIM PLAINTIFFS-APPELLANTS (REDACTED, PUBLIC FILING)**

---

KEVIN T. BAINE
THOMAS G. HENTOFF
STANLEY E. FISHER
WILLIAM J. VIGEN
JULIA H. PUDLIN
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

THE FOX ENTERTAINMENT GROUP, INC., FOX TELEVISION
HOLDINGS, INC., FOX CABLE NETWORK SERVICES, L.L.C.,

*Defendants*,

CBS CORPORATION, NBC UNIVERSAL MEDIA, L.L.C., SURVIVOR
PRODUCTIONS LLC, CBS STUDIOS INC.,

*Defendants-Counter-Claimants*,

CBS BROADCASTING INC.,

*Counter-Claimant*,

ECHOSTAR TECHNOLOGIES, L.L.C.,

*Counter-Defendant*.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Appellants certifies that:

ABC, Inc. is an indirect, wholly owned subsidiary of The Walt Disney Company, a publicly traded company.

American Broadcasting Companies, Inc. is an indirect, wholly owned subsidiary of The Walt Disney Company, a publicly traded company.

Disney Enterprises, Inc. is a wholly owned subsidiary of The Walt Disney Company, a publicly traded company.

/s/ Kevin T. Baine
Kevin T. Baine

## <u>TABLE OF CONTENTS</u>

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES PRESENTED ..........................................1

INTRODUCTION AND STATEMENT OF THE CASE ...............................4

STATEMENT OF THE FACTS ..................................................................6

     A.    ABC's Production and Distribution of Primetime
            Programming ....................................................................6

     B.    ABC's Limited Grant of Rights to DISH ........................9

     C.    DISH's PrimeTime Anytime/AutoHop Service ...........11

           1.    DISH Introduces PrimeTime Anytime and AutoHop .......11

           2.    How the Service Works ...........................................12

                 a.    PrimeTime Anytime ................................12

                 b.    AutoHop .................................................17

     D.    DISH Undermines Every Platform on Which ABC Makes
            Its New Primetime Shows Available ...........................20

           1.    Millions of Advertisements and Promos Skipped ..............21

           2.    VOD .......................................................................21

           3.    On-Demand Streaming and Commercial-Free
                Offerings ...............................................................22

     E.    Procedural History and the District Court's Opinion ..................23

SUMMARY OF ARGUMENT ....................................................................27

ARGUMENT .............................................................................................31

I.    PRELIMINARY INJUNCTION STANDARD AND
      APPELLATE STANDARDS OF REVIEW ..........................................31

II.   ABC SHOWED THAT DISH IS COMMITTING DIRECT
      AND VICARIOUS COPYRIGHT INFRINGEMENT ........................32

      A.    DISH Is Directly Infringing ABC's Copyrights...........................33

            1.    DISH Is Engaging in Volitional Conduct that Causes
                  the Infringement....................................................................33

            2.    DISH Is a Direct Infringer Because of Its Dominant
                  Contribution to the Unauthorized Copying........................40

            3.    Two or More Actors Can Join in Direct Infringement ......41

      B.    DISH Is Vicariously Infringing ABC's Copyrights.....................43

            1.    DISH Has the Right and Ability To Stop or Limit
                  the Infringement....................................................................44

            2.    DISH Has a Direct Financial Interest in the
                  Infringement .........................................................................46

III.  DISH FAILED TO PROVE THAT ITS OWN OR
      SUBSCRIBER COPYING IS A FAIR USE.........................................46

      A.    DISH Cannot Show that Its Direct Copying Is a Fair Use ........47

      B.    DISH Cannot Show that Subscriber Use of Its Service Is a
            Fair Use.........................................................................................51

            1.    Copying To Avoid Paying a Fee Is a Commercial Use......51

            2.    Whether Commercial or Noncommercial, Subscriber
                  Use of DISH's Service Causes Unfair Market Harm........53

            3.    *Sony*'s Time-Shifting Ruling Does Not Support a
                  Different Result ....................................................................56

IV.   ABC SHOWED THAT DISH IS BREACHING THE
      PARTIES' 2005 AGREEMENT ............................................................59

V.    ABC SHOWED THAT IT WOULD SUFFER IRREPARABLE
      HARM ABSENT AN INJUNCTION ....................................................60

      A.    The *Salinger* Court Expected that Preliminary Injunctions
            Against Copyright Infringement Will Remain Commonly
            Available ..................................................................................61

      B.    ABC Established that Absent an Injunction It Would
            Suffer Harm that Is Difficult To Measure or Replace .................62

            1.    Harm to ABC's Right to Exclusive Control of Its
                  Copyrights .................................................................63

            2.    Harm to ABC's Ability To Promote Its Own
                  Programming ..............................................................66

            3.    Harm to ABC's Negotiating Positions and
                  Relationships with Licensees ................................66

            4.    Harm to ABC's Ability To Earn Advertising
                  Revenue ....................................................................67

      C.    DISH's Breach of Contract Should Be Enjoined ..........................68

      D.    ABC Did Not Delay in Seeking Relief ...........................................69

VI.   THE OTHER FACTORS SUPPORT A PRELIMINARY
      INJUNCTION .....................................................................................70

CONCLUSION ................................................................................................71

# TABLE OF AUTHORITIES

## CASES

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ................................................................52, 53

*Am. Broad. Cos., Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 676 (2d Cir. 2013) ................................68, 70

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994) ................................................................49, 50, 52

*Arista Records LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ..............................32

*Arista Records LLC v. Lime Grp.*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011) ................................................................ 43-44, 46

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009)................................................................39

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)........................passim

*Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013)................................................................ 39, 40-41

*Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008)................................................................passim

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998) ................................................................49, 50, 53

*CEEB v. Pataki*, 889 F. Supp. 554 (N.D.N.Y. 1995)........................................54

*CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004)....................34

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ..........................61, 62

*Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F. Supp. 2d 372 (S.D.N.Y. 2003)................................................................70

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) ........................................................................................46

*Fox Broad. Co. v. DISH Network L.L.C.*, 905 F. Supp. 2d 1088 (C.D. Cal. 2012) ................................................ 20, 23-24

*Fox Broad. Co. v. DISH Network L.L.C.*, 723 F.3d 1067 (9th Cir. 2013) ................................................................24, 43, 56

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159 (2d Cir. 1971) ..............................................44, 45

*Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143 (7th Cir. 1992)..............................................44

*Harper & Row, Publ'rs, Inc. v. Nation Enters., Inc.*, 471 U.S. 539 (1985) ................................................................32, 47, 52

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) ............passim

*Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008)..................................... 64-65

*Lusk v. Vill. of Cold Spring*, 475 F.3d 480 (2d Cir. 2007)..................................31

*MGM Studios Inc. v. Grokster*, 545 U.S. 913 (2005) ........................29, 43-44, 45

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ................................................................ 39-40, 48

*Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543 (N.D. Tex. 1997)................................................................40

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) ........................ 68

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ..........................................passim

*SBCA v. FCC*, 275 F.3d 337 (4th Cir. 2001) ........................................................71

*Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp.*, 453 F.2d 552 (2d Cir. 1972) ..............................................42

*Sega Enters. Ltd. v. MAPHIA*, 857 F. Supp. 679 (N.D. Cal. 1994) .................52

*Shady Records, Inc. v. Source Enters., Inc.*, 2005 WL 14920 (S.D.N.Y. 2005) ................................................................................44

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012) ........................................................28, 42

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) .............................................................................passim

*Viacom Int'l, Inc. v. YouTube, Inc.*, 253 F.R.D. 256 (S.D.N.Y. 2008) ............................................................................................46

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) .......................45

*Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513 (S.D.N.Y. 2008) ......................................................................33

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal. 2011) ..............................................................63, 68

*White v. Marshall*, 693 F. Supp. 2d 873 (E.D. Wis. 2010) ................................44

*Worldwide Church of God v. Phil. Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000) ...................................................................53

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012) ..................................passim

*WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011) ..........................65

## STATUTES

17 U.S.C. § 101 ........................................................................................1

17 U.S.C. § 106 ......................................................................................32

17 U.S.C. § 107 ........................................................... 3, 47-48, 49

17 U.S.C. § 410 ......................................................................................32

28 U.S.C. § 1292 ....................................................................................1

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1332 ...................................................................................1

28 U.S.C. § 1338 ...................................................................................1

47 U.S.C. § 325 .....................................................................................9

## OTHER AUTHORITY

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*
   (5th ed. 1984) ................................................................................43

Appellants American Broadcasting Companies, Inc., ABC, Inc., and Disney Enterprises, Inc. (collectively, "ABC") have appealed from an order of the U.S. District Court for the Southern District of New York (Swain, J.) denying their motion for a preliminary injunction against appellee DISH Network L.L.C. ("DISH"). The order issued under seal on September 18, 2013, *see* Special Appendix ("SPA") SPA1-30, and is available in public, redacted form at 2013 WL 5477495, Joint Appendix ("JA") JA3062-91.

## JURISDICTIONAL STATEMENT

This is an action for copyright infringement, 17 U.S.C. §§ 101, *et seq.*, and breach of contract. The district court had jurisdiction over the copyright claims under 28 U.S.C. §§ 1331 and 1338 and the contract claim under 28 U.S.C. § 1332. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) because this is an interlocutory appeal of a denial of a preliminary injunction. ABC timely filed its notice of appeal on September 23, 2013, JA3092, within 30 days of the district court's order, *see* Fed R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES PRESENTED

1.     The defendant here is offering a service that copies in perpetuity the entire primetime lineup of four television networks selected by the

defendant.  After subscribers activate the service once, it (i) makes ███████ ███████████ of copies of these programs every night to populate on-demand, commercial-free libraries of the networks' most valuable primetime programming; (ii) physically prevents subscribers from canceling nightly recordings that are within 15 minutes of starting or are in progress; and (iii) consults programming guides every week to ensure that it also perpetually copies certain programs that begin or end outside of normal primetime hours.

Under *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"):

(a)    is the defendant engaging in "volitional conduct that causes the cop[ies] to be made," *id.* at 131?;

(b)    is the defendant's "contribution to the creation of an infringing copy" otherwise "so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the cop[ies]," *id.* at 133?; and

(c)    can the two actors who each join in the creation of unauthorized copies of copyrighted works—one who initiates the copying

process and the other who plans, executes, and continues the copying—both

be direct copiers?

2.    Does a defendant that operates the above-described service, ██

████████████████████████████████████████████, possess the right

and ability to supervise the copying sufficient to support liability for vicarious

copyright infringement?

3.    In evaluating the affirmative defense of fair use:

(a)    where a defendant's service provides no-fee access to

commercial-free versions of programs that subscribers would otherwise have

to pay for, is the "purpose and character" of the subscribers' use of the copies

commercial or noncommercial, 17 U.S.C. § 107(1)?; and

(b)    even if such use is noncommercial, did the district court err

in declining to consider whether the use, "if it should become widespread, . . .

would adversely affect the potential market for the copyrighted work," *Sony

Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984);

§ 107(4)?

4.    Does an agreement that prohibits a licensee from engaging in or

authorizing any copying of the licensor's programming, with an exception

only for the licensee's practice of connecting subscribers' digital video

3

recorders ("DVRs") or similar devices, allow the licensee to make or authorize millions of copies of the licensor's entire primetime schedule for commercial-free playback?

5.    Under *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), and *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), do copyright infringement plaintiffs establish that they will suffer a loss that is "difficult to replace or difficult to measure," 607 F.3d at 81, when they present evidence that a defendant's service would "dilute plaintiffs' programming and their control over their product," interfere with plaintiffs' distribution strategies, weaken plaintiffs' negotiating positions with authorized licensees and other business partners, harm plaintiffs' advertising revenue, 691 F.3d at 285-86, and thwart plaintiffs' efforts to promote their own programming?

## INTRODUCTION AND STATEMENT OF THE CASE

In this copyright and breach of contract action, ABC seeks to halt DISH's ongoing copying of ABC's entire lineup of primetime programming for on-demand, commercial-free playback. This massive copying effort not only targets the advertising that generates revenue through normal DVR viewing; it also takes aim at the many platforms on which ABC authorizes the sale of on-demand and commercial-free versions of its programming. In

4

short, at the same time that ABC has carefully constructed a distribution strategy to offer viewers nearly every on-demand and commercial-free viewing option that modern technology permits, DISH has set out to undermine each element of that strategy.  Through a nightly service that combines ██████████████████████████████, DISH is unfairly appropriating for itself the economic value of programming created by others.  This is precisely what copyright law prohibits.  ABC thus sought preliminary injunctive relief and has now appealed the denial of that relief, without hearing, by the district court (Swain, J.).  *See* SPA1-30, 2013 WL 5477495, JA3062-91.

As demonstrated in this brief, the district court's assessment of the merits of ABC's copyright claims was based on an unwarranted extension of this Court's volitional conduct holding in *Cablevision* and a misreading of the Supreme Court's fair use analysis in *Sony*.  And its assessment of irreparable harm ignored *WPIX v. ivi*, in which this Court held that the precise kind of harm shown here constituted irreparable harm sufficient to support a preliminary injunction.

## STATEMENT OF THE FACTS

**A.    ABC's Production and Distribution of Primetime Programming**

With some variation for time zone, the hours from 8:00 p.m. to 11:00 p.m. Monday through Saturday, and 7:00 p.m. to 11:00 p.m. Sunday, are known in television as primetime.  This is when most viewers watch television and when the four major broadcast networks—ABC, CBS, NBC, and FOX—air the programs on which they rely ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  JA1020, JA1419-20.

ABC invests significant sums of money to develop, produce, and acquire the premium-quality, creative programming that airs during primetime.  JA1020.  ABC owns the copyrights in many of these programs and acquires the rights to air the rest.  JA1020.[1]

ABC's programs are primarily distributed through the ABC Television Network (the "Network"), which provides broadcast programming to eight stations owned by ABC-related entities and more than 200 affiliated stations owned by third parties.  JA1019-20.  ABC programming is broadcast free of charge to 54 million Americans who watch television via over-the-air

---

[1] For ease of reference, this brief refers to the three Appellants collectively as "ABC."

antennas.  JA1021.  It is also delivered via cable, satellite, and similar

services by providers such as Comcast, Time Warner Cable, DirecTV and

DISH, who charge a fee to their subscribers.  JA1021, JA1026-27.

ABC's primetime programming would not be possible without the

revenue derived from advertising.  ███████████████████

█████████████████████████████████████████

██████████████████████████████████

███████████████████████████████

Advertisers pay for commercial time based on the size of the audience

of the advertisements that air during commercial breaks—principally as

measured by The Nielsen Media Research Company's "C3" rating.  JA1420-

21.  The C3 rating measures the average audience size during the

commercial minutes while the program is broadcast live and over the next

three days when it is played back at normal speed on a DVR or viewed via

certain on-demand services.  JA1022, JA1420.  ███████████████

████████████████████████████████████

████████████████████████████████████

When viewers watch programs using regular DVR playback, they have the

option to manually fast-forward (by use of a fast-forward or 30-second skip

button) through commercials.  JA1078.  ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

In the days after the live broadcasts, ABC also makes primetime programming available through a number of additional distribution platforms, pursuant to a carefully planned "windowing" strategy.  JA1020-25. The purpose of this strategy is to ensure that ABC protects its main revenue source—advertising time as measured by the C3 rating—while growing its other distribution platforms and giving consumers a range of viewing options to fit their needs.  JA1020-21.  As relevant to this appeal, ABC's key, post-broadcast distribution platforms include:

**Video-on-demand:** ABC has entered into dozens of video-on-demand ("VOD") agreements with cable and satellite providers, which enable their subscribers to access programs via on-demand menus on their TV screens. JA1022-23.  These VOD offerings are usually available a day after initial airing, for no additional charge to subscribers.  JA1022, JA2206-07.  To protect ABC's advertising revenue, its VOD agreements prohibit fast-forwarding through commercials.  JA1022-23.  DISH is the only one of the

top ten pay-TV providers that has not entered into a VOD agreement with ABC.  JA1022, JA1027.

**Internet streaming:** ABC makes digital versions of its programs available for on-demand Internet streaming on ABC.com and via authorized third-party providers such as Hulu.  JA1023-24.  These offerings are typically available the day after initial broadcast, at no charge to users. JA1023-24, JA2206-07.  Again, to protect ABC's advertising revenue, the commercials cannot be fast-forwarded or skipped.  JA1024.

**Digital distribution:** For consumers who would like to view versions of ABC's new primetime programs without advertising, ABC makes commercial-free versions available for paid downloading, typically starting the day after initial broadcast, from online services such as Apple (iTunes) and Amazon.  JA1024-25.  These versions can be viewed on consumers' computers and mobile devices.  JA1024-25.

## B.    ABC's Limited Grant of Rights to DISH

Under federal communications law, satellite television providers like DISH must obtain consent from a broadcast television station to retransmit its signal to subscribers in local markets.  47 U.S.C. § 325(b)(1)(A) & (b)(3)(C).  In 2005, ABC entered into a Retransmission Consent Agreement

("2005 Agreement") with DISH's predecessor, EchoStar Satellite L.L.C. JA1026-27, JA2948.  The 2005 Agreement grants DISH the limited right to "simultaneously receive and retransmit" the digital broadcast signal of eight stations owned by ABC-related entities (the "Digital Signal") to DISH's satellite television subscribers.  JA2948-49. ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

The 2005 Agreement gives DISH no contractual right to copy, or authorize the copying of, the Digital Signal.  JA2948-49.  Further, Section 12 of the agreement expressly prohibits any such copying: Except as otherwise permitted in the agreement (and not relevant here), "EchoStar shall not, for pay or otherwise, record, copy, duplicate, retransmit, and/or authorize the recording, copying, duplication or retransmission of any portion of any Digital Signal without the prior written consent of Broadcaster."  JA2967.  The prohibition is subject only to the clarification that "[t]he foregoing shall not preclude EchoStar's practice of connecting subscribers' home recording devices such as VCRs or DVRs . . . ."  JA2967.

███████████████████████████████

████████████████████████████

█████████████████████

### C.    DISH's PrimeTime Anytime/AutoHop Service

#### 1.    DISH Introduces PrimeTime Anytime and AutoHop

Like other cable or satellite providers, DISH furnishes subscribers with combination tuner/DVR set-top boxes that receive incoming signals and can make digital recordings of programs. JA2276-81. In March 2012, in connection with the introduction of a new set-top box called the Hopper, DISH launched a new service called PrimeTime Anytime, which by default perpetually records every primetime program broadcast by the four major television networks and stores them for eight days. JA385-86, JA397, JA553, JA798, JA2283. According to DISH, PrimeTime Anytime "creates an on-demand library of approximately 100 hours of primetime TV shows" every week. JA798. This is, DISH says, "the only way to get access to 100 percent of prime time shows from the last eight days on demand." JA917.

In May 2012, DISH added AutoHop to the service. JA801. When playing back PrimeTime Anytime copies, AutoHop "skip[s] all commercials for most recorded primetime HD programs shown on ABC, CBS, NBC and

11

FOX and when viewed the day after airing." JA801. Calling AutoHop "a revolutionary development that no other company offers," JA801, DISH announced that it had "created commercial-free TV," JA2974.

As part of the largest advertising campaign in its history, DISH has spent millions of dollars advertising its service as providing "instant On Demand access to your favorite primetime shows," JA501, and allowing consumers to "Watch Commercial-Free TV," JA520-21.

At the time of ABC's motion in late 2012, DISH's service was available to ██████████████ subscribers who used the Hopper set-top box,██
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████

### 2.    How the Service Works

#### a.    PrimeTime Anytime

DISH subscribers sign up for PrimeTime Anytime the same way they would activate any service on their set-top box: by pushing a couple of buttons on their remote control. On an on-screen menu showing the

12

PrimeTime Anytime option, subscribers select "Enable," are then shown a

screen with a limited set of choices, and finish the activation process by

selecting "Done."  JA551-53.  Having done this once, subscribers can

continue to receive PrimeTime Anytime copies every night, in perpetuity,

without ever having to take any additional action.  JA397, JA726.  By default,

DISH has set PrimeTime Anytime to record all four major networks, all

seven days of the week, and to store the recordings for eight days:



JA553.  The only adjustments that subscribers can make to the service are to

deselect a network in its entirety, deselect a day of the week in its entirety,

or limit the storage time to a minimum of two days.  JA385-88, JA553.

After PrimeTime Anytime is activated, DISH does everything else. From that time forward, DISH causes every ABC, CBS, NBC, and FOX primetime program to be recorded on the hard drives of subscribers.  JA397-98, JA498, JA916-17.  As DISH explains:





JA3009-12.

With PrimeTime Anytime, DISH has thus created the functional equivalent of its competitors' licensed VOD services.  After subscribers have activated the service once, it operates just like VOD to permit them to make on-demand selections from more than 100 recent network primetime programs at a time.  This means that, just like with VOD, subscribers are

given later, on-demand access to shows they had not even known existed at the time of broadcast. As DISH itself emphasizes: "The magic of PrimeTime Anytime is that it allows DISH subscribers to catch up on all primetime shows, including episodes recorded over the past week and recommended by friends, family, and co-workers after they've already been broadcast." JA801.

Behind the scenes, DISH (via its agent EchoStar Technologies L.L.C. ("EchoStar")) uses ongoing subscriptions to electronic program guides to ensure that if at least half of a program occurs within normal primetime hours in any locale served by PrimeTime Anytime, that program will be recorded in full as part of PrimeTime Anytime. JA382-84. DISH therefore decides for locations all across the country when to start or stop the PrimeTime Anytime recording outside of normal primetime hours. Examples include when an ABC college football game starts at 7:00 p.m., JA577, or an ABC NASCAR race ends at 11:30 p.m., JA576. ███████████

███████████████████████████████████████

████████████████████████████████████████

███████

DISH subscribers, by contrast, have no ability to adjust when the nightly recording of all four networks' schedules starts or finishes because "that's a DISH . . . function." JA382-83. Subscribers also are prevented from (i) canceling the nightly recording if they try to do so within 15 minutes before the start time; (ii) canceling a nightly recording that is in progress; or (iii) deleting a recording before two days have elapsed. JA370-71, JA390-91, JA2283, JA2286-88.[2] DISH overrides customer choice here because it believes this "enhance[s] the user experience by promoting peace in the household. Otherwise, one family member might stop all PTAT recordings without realizing how many scheduled recordings are affected by that choice." JA2287-88; JA360. This explanation notwithstanding, DISH locks out not only subscribers who live with family members but also those who live alone.

---

[2] The district court's belief that a subscriber "can choose to delete a PTAT recording prior to the date set for deletion," SPA7, was mistaken, █

█████████████████████████████████████████████

█████████████████████████████████████████████

██████

16

**b.    AutoHop**

DISH automatically provides the AutoHop commercial-skipping

service to all subscribers who have activated PrimeTime Anytime. JA465,

JA467. Early each morning, EchoStar transmits instructions to subscribers'

Hopper set-top boxes that enable the boxes to identify and skip over all of

the commercial breaks in the previous night's PrimeTime Anytime

recordings. JA305-06, JA426-27.

As soon as AutoHop playback is available to subscribers, a red

kangaroo icon appears next to a recording in an on-screen folder. JA426. If

subscribers choose to play back the recording, they see this pop-up window:



JA543.  To play back the program, subscribers must select either "Yes" or "No Thanks."  JA543; JA241-42, JA426-27.  When they select "Yes," all the commercials are skipped automatically on playback.  JA741.

AutoHop is available only to subscribers who have activated PrimeTime Anytime; its instructions act upon the PrimeTime Anytime recordings.  JA288-89, JA395, JA402, JA467, JA471-72.  The recordings that DISH makes via PrimeTime Anytime thus serve two closely related purposes.  First, they are used to create an on-demand library of the networks' latest primetime programming.  Second, they are used to supply the inventory that AutoHop needs for its commercial-skipping service.  DISH's own advertising so boasts:




JA3025-26.

██████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

18



██████████████████████ EchoStar does all this work, every night, to ensure that the commercial-skipping service works properly with the PrimeTime Anytime copies.[3]

### D. DISH Undermines Every Platform on Which ABC Makes Its New Primetime Shows Available

DISH's service directly targets what has traditionally been, and remains, ABC's principal source of revenue—advertising. It also competes directly with the platforms ABC has developed more recently for on-demand television and internet viewing, including the distribution of commercial-free versions of its programs. DISH thereby undermines every platform on which ABC makes its primetime shows available and every source of revenue that supports the development of that programming.

---

[3] For several months in 2012, DISH made extra copies of ABC's primetime programs at the Cheyenne facility to quality check AutoHop's performance. Shortly before ABC filed its preliminary injunction motion, the Central District of California ruled in a related case that DISH's quality assurance copies were likely copyright infringements and breaches of contract. *See Fox Broad. Co. v. DISH Network L.L.C.*, 905 F. Supp. 2d 1088, 1106, 1108 (C.D. Cal. 2012). DISH ██████████████████████████ ██████████████████████ agreed in this case not to resume until an adjudication on the merits as to their legality. ABC therefore did not pursue a preliminary injunction as to that copying.

### 1.    Millions of Advertisements and Promos Skipped

DISH promises that AutoHop skips so many commercials that "you can save an hour each night!"  JA497.  ████████████████████

████████████████████████████████

█████████████████████████████████

███████████████████████████████

██████████████████████████████

███████████████████

Critically, the commercials that AutoHop automatically bypasses include the promotional spots on which ABC itself depends to attract viewers.  ABC itself runs the most advertisements on ABC, forgoing millions of dollars in advertising revenue each week to promote its own upcoming shows during commercial breaks.  More viewers learn about new ABC shows from these promotional spots than from any other source.  JA1423.  ████████

████████████████████████████████

█████████████████████

### 2.    VOD

DISH specifically promoted PrimeTime Anytime as a competitor to the primetime VOD services every other top-ten, pay-TV service acquired a license to provide.  JA511, JA559.  DISH filed a trademark application

describing PrimeTime Anytime as a "video-on-demand service."  JA779.  ███

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

From the perspective of consumers, PrimeTime Anytime operates just like a VOD service.  Reflecting this fact, ██████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

### 3.     On-Demand Streaming and Commercial-Free Offerings

DISH's service also competes directly with on-demand download and streaming services.  In a media interview, a DISH executive admitted that DISH's frustration with competition from commercial-free download services like iTunes was a reason it decided to launch AutoHop.  JA804.  Another DISH executive touted the advantages of accessing PrimeTime Anytime

22

over the Internet: "while other pay TV providers like Hulu give you access to some of your content after a delay, with the Hopper, customers get instant access to all the prime time shows the same day they air." JA931. The executive even predicted that "I don't think you'd ever need Hulu Plus or Hulu after this." JA939.

### E.    Procedural History and the District Court's Opinion

DISH well understood the explosive effect of its service on the television industry. On May 24, 2012, just fourteen days after announcing AutoHop, DISH initiated this defensive lawsuit for a declaratory judgment, minutes and hours before CBS, NBC, and Fox sued DISH in the Central District of California. JA2923. ABC, the only party not to contest venue, filed counterclaims for copyright infringement and breach of contract four weeks later, giving notice that it sought a preliminary injunction. JA2924.

After initial procedural disputes over venue were resolved, copyright and contract claims brought by CBS proceeded in New York, consolidated with ABC's case. Similar claims against DISH by NBC and Fox proceeded in California. All of these cases are currently pending.[4]

---

[4] Fox moved for a preliminary injunction in the California action in August 2012. The district court denied the motion, *Fox Broad.*, 905 F. Supp. 2d 1088,

23

Pursuant to a court-approved expedited discovery and briefing schedule, ABC filed a preliminary injunction motion in November 2012 and requested oral argument. (District Ct. Docket No. 149). The motion was fully briefed on January 15, 2013. (District Ct. Docket No. 169).

In moving for a preliminary injunction, ABC argued and presented evidence that DISH was engaged in direct or vicarious copyright infringement and was breaching its agreement with ABC. ABC also submitted evidence that unless its service was stopped, DISH would cause irreparable harm to ABC's right to exclusive control over its copyrighted works, its relationships and negotiations with authorized licensees, its advertising revenue, and its ability to promote its own programming during commercial breaks.

The district court did not act on the motion until more than eight months after ABC filed its reply brief. On September 18, 2013, without

---

a decision that the Ninth Circuit affirmed, 723 F.3d 1067 (9th Cir. 2013). Fox's petition for rehearing and rehearing en banc is currently pending; on August 30, 2013, the Ninth Circuit ordered DISH to file a response to Fox's petition. *See* Order, *Fox Broad Co.*, No. 12-57048 (9th Cir. Aug. 30, 2013) (Docket No. 99).

holding the oral argument that ABC had requested, the district court issued
an order denying ABC's motion.  SPA1.  The court held that ABC was
unlikely to succeed on the merits of its claims for direct copyright
infringement because, as the court interpreted *Cablevision*, "the pivotal
factor in this Circuit for direct liability is <u>initiation</u> of the act of copying."
SPA12, 13-14 (emphasis added).  Subscribers initiated the act of copying by
enabling PrimeTime Anytime, the court reasoned, and it was "not material"
whether or not DISH employees continued to take manual or automated
steps to keep making the copies thereafter.  SPA8.  The district court
rejected ABC's claims for vicarious copyright infringement on essentially the
same ground: The court concluded that DISH lacked the "right and ability to
supervise" the unauthorized PrimeTime Anytime copying because DISH
"has no control" over subscribers' decisions whether or not to activate the
service or which set of limited recording options they pick.  SPA14.

The district court next held, in the alternative, that "although ABC
clearly can show that DISH's customers make unauthorized copies of its
programming," SPA14, DISH had met its burden of proof that copying by
subscribers qualifies as a fair use.  SPA16.  The court concluded that the
subscribers make only noncommercial use of PrimeTime Anytime

recordings, and that there was no occasion to evaluate the harm to the market for ABC's copyrighted works because the subscribers were not themselves offering the works for sale. SPA15-16 ("[W]ith respect to the fourth factor, DISH <u>subscribers</u> are not offering a substitute market" for ABC's works (emphasis in original)). The district court rejected ABC's claim that DISH breached the unauthorized copying prohibition of the parties' 2005 Agreement, reasoning that an exception to the provision concerning DISH's practice of connecting subscriber DVRs meant that the agreement did not prohibit the nightly copying of ABC's entire primetime lineup for commercial-free playback. SPA18.

Finally, the district court relied principally on non-copyright cases to hold that ABC's evidence of irreparable harm was too speculative or conclusory, and that ABC's licensing of different rights to other parties meant that damages here were reasonably calculable. SPA19-20. In reaching this conclusion, the court ignored recent Second Circuit guidance on irreparable harm in copyright infringement cases, including a case, *WPIX v. ivi*, in which this Court specifically accepted as sufficient the same type of irreparable harm evidence that the district court discounted.

26

ABC filed a notice of appeal on September 23, 2013, JA3092, and this Court on October 23, 2013 granted ABC's request to expedite briefing and consideration of this appeal (2d Cir. Docket No. 31).

## SUMMARY OF ARGUMENT

1.    The district court's direct infringement holding was based on an unwarranted extension of the principle articulated in *Cablevision*—that liability for direct copyright infringement requires volitional conduct that causes a copy to be made.  The *Cablevision* Court held that a defendant's providing a remote DVR that automatically obeys a user's command to make a copy of a specific program does not constitute volitional conduct by the defendant.  Here, DISH does much more than that.  It is engaging in volitional conduct, within the meaning of *Cablevision*, by selecting the specific channels and programs to record; by exercising exclusive control over the copying process; and by operating the service to record shows that subscribers do not specifically select or even know exist, months and years after a one-time activation by subscribers.  The district court erred by holding that none of that matters, as long as subscribers are the ones who on one occasion "initiate[] the challenged recording process."  SPA8.

27

In the alternative, answering the question expressly left open in *Cablevision*, DISH's "contribution to the creation of an infringing copy [is] so great that it warrants holding [DISH] directly liable for the infringement, even" if the Court determines that "another party has actually made the copy." 536 F.3d at 133.

By focusing only on the "initiation" of one part of the copying process, the district court's decision is in conflict with the recent direct-infringement holding of the U.S. Court of Appeals for the First Circuit in *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 57-58 (1st Cir. 2012). Upon reviewing this Circuit's precedent, the First Circuit held that two actors joining in the same infringement of a copyrighted work can both be jointly and severally liable for direct infringement.

2.     The district court also erred as a matter of law in holding that DISH could not be liable for vicarious infringement because it "has no control" over whether subscribers decide to activate the PrimeTime Anytime service in the first place or which set of limited recording options subscribers choose. SPA14. Vicarious liability does not require a finding that a defendant can force third parties to use its service. Rather, a party may be vicariously liable if it could stop or limit ongoing copyright infringement but

28

refrains from doing so because it is profiting from the activity.  *See MGM Studios Inc. v. Grokster*, 545 U.S. 913, 930 (2005).  The undisputed facts here show that DISH, which controls ███████████████████████ ████████████████, possesses a right and ability to supervise that is more than sufficient to hold it liable for vicarious infringement.

3.    The district court did not address whether DISH could establish that its own copying qualifies as a fair use.  Given the commercial nature of DISH's copying, its plainly substitutional character, and the uncontroverted evidence that DISH is using the copies to compete directly with and undermine licensed ABC offerings in a number of markets, DISH cannot carry its burden of proving fair use.

With regard to copying by subscribers, the district court erred in holding that subscribers' use of PrimeTime Anytime/AutoHop is noncommercial, since DISH's service gives every subscriber access each week to dozens of commercial-free versions of newly broadcast primetime programs for which they would otherwise have to pay a fee.  This is a commercial use.

The most fundamental legal error in the district court's fair use analysis, however, was its failure to give any consideration to the critical

"market harm" fair use factor, based on the mistaken conclusion that the factor is only considered if the challenged uses are commercial.  That is directly contrary to the Supreme Court's opinion in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 450-51 (1984).  The analysis of market harm that should have occurred demonstrates that the large-scale nightly copying engineered by DISH unfairly substitutes for ABC's licensed commercial-free and on-demand offerings in a number of markets now, and would harm ABC's advertising-supported business model if the practice were to become widespread.

4.    The district court misinterpreted the unambiguous language of the parties' 2005 Agreement.  The clear purpose of the agreement's broad prohibition against copying was to require ABC's prior written consent before DISH made or authorized copies of ABC programs.  The unauthorized uses that DISH makes of millions of copies of ABC's programs—including to supply content to DISH's nightly commercial-skipping service—are exactly the harmful conduct that the agreement was intended to and does in fact prohibit.

5.    Finally, ignoring recent Second Circuit authority on the standard for establishing irreparable harm in copyright infringement cases, the

30

district court applied an overly restrictive test for such harm. This error

undermined the rest of the court's irreparable harm analysis.

## ARGUMENT

## I.  PRELIMINARY INJUNCTION STANDARD AND APPELLATE STANDARDS OF REVIEW

According to the principal test used in the Second Circuit, for a

preliminary injunction to issue plaintiffs must show: "(1) a likelihood of

success on the merits; (2) irreparable harm in the absence of an injunction;

(3) a balance of the hardships tipping in their favor; and (4) non-disservice of

the public interest by issuance of a preliminary injunction." *WPIX, Inc. v.*

*ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012).

The grant or denial of a preliminary injunction is reviewed for abuse of

discretion. *WPIX v. ivi*, 691 F.3d at 278. Under this standard, "[q]uestions

of law decided in connection with requests for preliminary injunctions . . .

receive the same de novo review that is appropriate for issues of law

generally." *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 484 (2d Cir. 2007)

(quotation omitted). The standard of review for the district court's factual

findings is clear error. *WPIX v. ivi*, 691 F.3d at 278.

31

## II.    ABC SHOWED THAT DISH IS COMMITTING DIRECT AND VICARIOUS COPYRIGHT INFRINGEMENT

Section 106(1) of the Copyright Act grants the copyright owner the exclusive right "to reproduce the copyrighted work in copies" and to authorize others to do the same.  By granting this exclusive right, and thereby establishing a "marketable right to the use of one's expression," the Copyright Act "supplies the economic incentive to create and disseminate ideas."  *Harper & Row, Publ'rs, Inc. v. Nation Enters., Inc.*, 471 U.S. 539, 558 (1985).

To establish infringement under the Copyright Act, a plaintiff must show: (1) ownership of a valid copyright and (2) unauthorized, unprivileged copying of constituent elements of the work that are original.  *See Arista Records LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010).  Whether accomplished by DISH directly or indirectly, the ongoing creation of ██████████████████████ on-demand, commercial-free libraries of ABC's newest primetime programming is clearly unauthorized.  SPA14.[5]

---

[5] ABC's valid copyrights may be presumed from the copyright registration certificates that ABC put in evidence.  17 U.S.C. § 410(c); JA1426-1518.

While ABC bears the burden of establishing the likelihood that DISH is infringing copyrights directly or indirectly, DISH bears the burden of establishing the affirmative defense of fair use. *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998); *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 554 (S.D.N.Y. 2008).

**A.     DISH Is Directly Infringing ABC's Copyrights**

**1.     DISH Is Engaging in Volitional Conduct that Causes the Infringement**

In *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), this Court held that direct liability for copyright infringement requires that a defendant engage in "volitional conduct that causes" the infringement. *Id.* at 131. DISH is engaged in such conduct in every sense—from its initial selection of four networks' primetime lineups for later on-demand and commercial-free viewing, to its preventing subscribers from exercising basic control over the nightly recordings made by the service, to its subsequent actions to ensure the ongoing copying of the networks' complete primetime lineups in locations all across the United States.

This is a far cry from *Cablevision*. That case involved a remote storage DVR maintained on Cablevision servers that subscribers used to make

33

recordings of specific television programs. 536 F.3d at 124, 130-33.
According to the Court, the remote DVR in *Cablevision* differed from a
typical in-home DVR only in that it was located at Cablevision—its function
and operation were otherwise the same. *Id.* at 125. The Court stated that "a
customer's conduct in ordering th[e] system to produce a copy of a specific
program" was the same as that of the user of a VCR or DVR. *Id.* at 131.
Cablevision's relevant conduct, the Court said, was limited to "designing,
housing, and maintaining a system that exists only to produce a copy,"
whereas its subscribers provide "the necessary element of volition" by
"ordering that system to produce a copy of a specific program," which it then
"automatically obeys" to make the copy. *Id.*

    "'[T]o establish direct liability,'" *Cablevision* stated, "'something more
must be shown than mere ownership of a machine used by others to make
illegal copies. There must be actual infringing conduct with a nexus
sufficiently close and causal to the illegal copying that one could conclude
that the machine owner himself trespassed on the exclusive domain of the
copyright owner.'" 536 F.3d at 130 (emphasis omitted) (quoting *CoStar Grp.,
Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004)). In *Cablevision* itself,
the Court emphasized that "[w]e conclude only that on the facts of this case"

Cablevision's conduct was not "sufficiently proximate to the copying to displace the customer as the person who 'makes' the copies." *Id*. at 132, 133.

The district court drew the wrong lesson from *Cablevision*. It concluded that none of DISH's conduct before or after subscribers activate PrimeTime Anytime is "material" to volitional conduct because "the pivotal factor in this Circuit for direct liability is <u>initiation</u> of the act of copying," for which the district court said subscribers are solely responsible. SPA8, 12 (emphasis added).

*Cablevision*, however, did not limit the volitional conduct analysis to a single phase of the copying process. To the contrary, drawing a contrast between Cablevision's conduct in operating its remote-DVR system and in operating its VOD service, the Court pointed out that the operator of a VOD service "actively selects and makes available beforehand the individual programs available for viewing," 536 F.3d at 132, even though users of VOD services also must then press a button to access a specific program.[6]

---

[6] The district court read *Cablevision* as finding that the defendant "selected the programming that its subscribers could copy." SPA12-13. That is incorrect. To the contrary, this Court said that although Cablevision "considered" limiting the number of channels available for remote-DVR recording, it did not do so, and exercised no control over which programs subscribers chose to copy. 536 F.3d at 125, 132.

35

Here, DISH engages in a series of volitional acts that occur before and long after subscribers' one-time activation of the service.

1.    DISH "actively selects and makes available beforehand the individual programs available" for later on-demand, commercial-free "viewing," 536 F.2d at 132—namely, the most popular and valuable programs, which air in primetime on the four major networks.  DISH thus acts like a provider of a VOD service. ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

████████████████████████████████

████████████████

The district court distinguished PrimeTime Anytime from a VOD service on the ground that "[a] VOD service . . . makes time-shifted viewing of designated content available without any prior customer request."  SPA18. But that is effectively how PrimeTime Anytime works.  After subscribers

have signed up for the service by activating it once, DISH takes care of identifying and perpetually pre-delivering all of primetime for later on-demand viewing. As one DISH executive put it, "I just don't have to think about what to watch. . . . I always have something from last night sitting right there waiting for me." JA945. DISH has planned its conduct to mimic that of a VOD provider. And it does. In actively selecting the programs to be available for later on-demand viewing, DISH is engaging in volitional conduct that causes the infringement.

2.    Unlike in *Cablevision*, in which the only copying that occurred was the result of "a customer's conduct in ordering that system to produce a copy of a specific program," 536 F.3d at 131, DISH actually locks subscribers out of copying decisions in their own homes. Thus, DISH exclusively controls the start and stop times of the nightly PrimeTime Anytime recordings. JA382-83. DISH even prevents subscribers from canceling the nightly recording that is about to begin or is in progress, and from deleting a recording before two days have elapsed, because, in DISH's view, <u>other</u> household members might want to play back those recordings later. JA370-71, JA390-91, JA2283, JA2286-88.

37

3.    Operating PrimeTime Anytime for months and years after subscriber activation, DISH engages in continuing, post-activation volitional conduct for subscribers. This includes consulting weekly electronic program guides ("EPGs") to ensure that DISH copies all network programs that fit its definition of primetime in locations all across the country, ███████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

The district court disregarded all of this conduct because it occurred after subscribers, in the court's view, "initiat[ed]" the copying. SPA8, SPA12. But in a broader sense, it was DISH that "initiated" the series of events that led to the copying. And its ongoing volitional conduct at every stage contributed much more to the ongoing copying than its subscribers' one-time activation of the service. In fact, its weekly decisions to include programs extending beyond normal primetime hours is the <u>most</u> "close and causal" conduct with respect to the copying of those programs, *Cablevision*, 536 F.3d at 130, because it occurs long after the last action by subscribers and results in copies that would not be created without it.

That DISH may have implemented these ongoing copying decisions via software rather than manually, SPA7-8, does not make DISH's conduct any less volitional.  Courts recognize that defendants can be directly liable for copyright infringement when they use software to implement their copying decisions.  For example, in a recent Southern District of New York case, *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013) (Sullivan, J.), the court held that the defendant was directly liable under *Cablevision* where the defendant had used a software program to locate and upload copyrighted iTunes songs on customers' computers.  *Id.* at 645-46. The court explained that "[w]hile that process is itself automated, absolving ReDigi of direct liability on that ground alone would be a distinction without a difference.  The fact that ReDigi's founders programmed their software to choose copyrighted content satisfies the volitional conduct requirement . . . ." *Id.* at 657; *see also Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 147-49 (S.D.N.Y. 2009) (applying *Cablevision* and finding "volitional conduct" where defendants' "active steps" to make copies included "automated filtering"); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 & n.6 (9th Cir. 2007) (prima facie case that defendant displayed thumbnail images where its "computers . . . initiate[d] and control[led] the

storage and communication" of the images); *Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 549, 552 (N.D. Tex. 1997).

### 2.    DISH Is a Direct Infringer Because of Its Dominant Contribution to the Unauthorized Copying

In the alternative, the question that *Cablevision* left open—"whether one's contribution to the creation of an infringing copy may be so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy," 536 F.3d at 133—should be answered in the affirmative here. That was not the case in *Cablevision*, this Court held, because Cablevision simply offered a system that subscribers could use, when they wanted, to direct the software to record a specific program that the subscriber selected. *See id.* at 133. It is the case here, because DISH is by far the most significant contributor to the massive copying it orchestrates.

In *ReDigi*, the court addressed this open question. The defendant there operated a service that was limited, by the defendant's design, to copying and distributing only copyrighted works that a customer had purchased via iTunes and then uploaded with the help of ReDigi's software. 934 F. Supp. 2d at 645-46. Granting summary judgment for the plaintiff copyright holder, the court held that if a defendant's direct liability for the

copying of another "could ever occur, it has occurred [here]," where ReDigi had "built a service where <u>only</u> copyrighted work could be sold." *Id.* at 657 (emphasis in original).

*ReDigi*'s analysis supports DISH's direct liability here. Indeed, ReDigi's contribution to the challenged copying pales in comparison to DISH's. DISH has selected the channels that are eligible for PrimeTime Anytime copying; decided the time of day when the copies can be made; promoted the service as recording programs before subscribers are aware of their existence; relied on the copies as inventory for its nightly commercial-skipping service; deprived subscribers of control over the copying process; and ensured that the nightly copying of primetime line-ups continues in perpetuity. JA385-87, JA397, JA553, JA726, JA801, JA2285-86. It is difficult to imagine what DISH could have done to dominate more thoroughly a copying process nominally initiated by subscribers.

### 3.    Two or More Actors Can Join in Direct Infringement

Having read *Cablevision* to mean that the "pivotal factor" for volitional conduct is "initiation" of the copying process, the district court held that ABC was unlikely to prove direct infringement "because . . . the consumer makes the copy." SPA12-13. But nothing in *Cablevision* in particular, or

copyright law in general, requires that only one of two or more joint actors can act volitionally or be liable for direct infringement.

The Second Circuit has long recognized the concept of joint and several liability for copyright infringement. *See, e.g.*, *Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp.*, 453 F.2d 552, 554 (2d Cir. 1972). Examining this Circuit's authority, the First Circuit recently affirmed the grant of summary judgment against a defendant who was found jointly and severally liable with another actor for direct copyright infringement. The defendant, an archbishop, had argued that, under *Cablevision*'s volitional conduct analysis, he could not be liable for uploading infringing religious texts because another actor, a monk, was the only one "who posted the disputed Works on the website." *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 54 (1st Cir. 2012).

Rejecting this argument, the First Circuit held that even if direct infringement requires a finding of volitional conduct, both the monk who physically posted the works on the website and the defendant archbishop who "performed several acts to ensure that copies of the Works were available" on the website were liable as direct infringers. 689 F.3d at 56-58. The same reasoning applies here: DISH subscribers' involvement in direct

42

copying does not mean that DISH is not also involved and subject to liability for its own volitional conduct.[7]

## B.  DISH Is Vicariously Infringing ABC's Copyrights

DISH is liable, in the alternative, for vicarious copyright infringement. A defendant is liable vicariously "if it 'profit[s] from direct infringement while declining to exercise a right to stop or limit it.'  To establish liability, a plaintiff must show that the defendant '[1] had the right and ability to supervise the infringing activity and . . . [2] has a direct financial interest in such activities.'" *Arista Records LLC v. Lime Grp.*, 784 F. Supp. 2d 398, 434-35 (S.D.N.Y. 2011) (quoting *MGM Studios Inc. v. Grokster*, 545 U.S. 913, 930

---

[7] In *Fox Broadcasting Co. v. DISH Network L.L.C.*, 723 F.3d 1067 (9th Cir. 2013), a case concerning the same DISH service, the Ninth Circuit held that the district court had not abused its discretion in concluding that DISH was not a direct infringer.  *Id.* at 1080.  The Ninth Circuit relied, however, on a misquotation of a tort treatise to preclude the possibility that two or more actors could each be liable for joining in a direct infringement.  *Compare* W. Page Keeton et al.*, Prosser and Keeton on the Law of Torts* § 42, at 273 (5th ed. 1984) (proximate causation "sometimes said to depend on whether the conduct has been <u>so</u> significant and important a cause that the defendant should be legally responsible" (emphasis added)) *with* 723 F.3d at 1073-74 (misquoting treatise as asking instead which actor is "'the <u>most</u> significant and important cause'" (emphasis added)).

(2005) and *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)) (citations omitted).

A type of secondary liability, vicarious infringement requires proof of "direct infringement by the relevant third party." *Lime Grp.*, 784 F. Supp. 2d at 423. The district court found that "ABC clearly can show that DISH's customers make unauthorized copies of its programming," SPA14, and we show in the next section why that unauthorized copying fails to qualify as a fair use.

Focusing on only the right and ability to supervise prong, the district court erred by holding that DISH's control over the copying was insufficient even to meet a liability standard that courts have recognized as "expansive," *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992), "relatively broad," *Shady Records, Inc. v. Source Enters., Inc.*, 2005 WL 14920, at *27 (S.D.N.Y. 2005), and "lenient" rather than "demanding," *White v. Marshall*, 693 F. Supp. 2d 873, 887 (E.D. Wis. 2010).

## 1.    DISH Has the Right and Ability To Stop or Limit the Infringement

As demonstrated above, DISH controls every aspect of the service at issue in this case, both before and after subscribers activate the service.

44

████████████████████████████

█████████████████████████████

█████████████████████████████

████████████████████████████

███████████████████  This is all that is required to satisfy the right and ability to supervise element. *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 37 (2d Cir. 2012) ████████████████████

█████████████████████████████

████████████████████

The district court's conclusion that DISH lacks even the right and ability to supervise is contrary to controlling precedent. The court reasoned that DISH "has no control over whether its subscribers will enable [DISH's] technology or what," within the narrow range of recording options allowed by DISH, "they will choose to copy." SPA14. But the liability question here is not whether DISH can force subscribers to use the service, but whether, when subscribers' use of the service constitutes infringement, DISH fails to exercise the right and ability to limit or stop the infringement while profiting from it. *See Grokster*, 545 U.S. at 930; *Gershwin Publ'g Corp.*, 443 F.2d at 1162. ████████████████████████████████

45

*See Lime Grp.*, 784 F. Supp. 2d at 435.

### 2.    DISH Has a Direct Financial Interest in the Infringement

Although not addressed by the district court, ABC's evidence easily satisfied the financial interest prong of the vicarious liability test. Financial benefit exists where the availability of infringing material "act[s] as 'a 'draw' for customers.'" *Viacom Int'l, Inc. v. YouTube, Inc.*, 253 F.R.D. 256, 261 n.3 (S.D.N.Y. 2008) (quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996) (financial benefit may be shown where "infringing performances enhance the attractiveness of the venue to potential customers" and act as "a 'draw' for customers")). DISH admitted repeatedly that it used its unauthorized service as just such a draw. *See, e.g.*, JA445 ("[T]he AutoHop feature gives us a marketing claim . . . designed to get customers in the door."); JA902 (PrimeTime Anytime and AutoHop "have been driving new customer acquisitions for DISH over the quarter." ).

## III.    DISH FAILED TO PROVE THAT ITS OWN OR SUBSCRIBER COPYING IS A FAIR USE

Fair use is an affirmative defense to copyright infringement. *Infinity Broad. Corp.*, 150 F.3d at 107. If, as ABC contends, DISH's operation of

46

PrimeTime Anytime/AutoHop is direct copying, the fair use inquiry asks whether DISH's own commercial use can qualify as a fair use, and DISH cannot rely on any fair use arguments that could be made regarding subscriber copying. *See id.* at 108. On the other hand, if DISH is vicariously responsible for the copying, focus shifts to the nature and impact of the uses made by its subscribers. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447-56 (1984).

## A.    DISH Cannot Show that Its Direct Copying Is a Fair Use

Having concluded that DISH is not a direct copier, the district court did not address whether DISH can prove that its own copying is privileged as a fair use. DISH clearly cannot.

Section 107 of the Copyright Act codified the longstanding equitable defense of "fair use," which the Supreme Court summed up as asking the essential question: "would the reasonable copyright owner have consented to the use?" *Harper & Row, Publ'rs, Inc. v. Nation Enters., Inc.*, 471 U.S. 539, 549-50 (1985) (quotation omitted). Section 107 lists "four nonexclusive factors to be considered" in conducting a fair use analysis, *id.* at 549: (1) the "purpose and character of the use, including whether such use is of a commercial nature"; (2) "the nature of the copyrighted work"; (3) "the

amount and substantiality of the portion used"; and (4) "the effect of the use on the potential market for or value of the copyrighted work," 17 U.S.C. § 107. Alone and in the aggregate, these factors all weigh decisively against a finding of fair use here.

In *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994), the Supreme Court made clear that the first and fourth factors have an interrelationship that guides the fair use inquiry: The less transformative an unauthorized use is (factor one), the more likely it is to merely substitute for, or usurp, the legitimate, actual and potential markets for the copyright owner's original work (factor four) and therefore fail to qualify as a fair use. *See id.* at 591. Accordingly, we address factors one and four together, and then factors two and three.

**Factors One and Four:** The "central purpose" of the inquiry under the first factor is whether the new work is "transformative," that is, whether it "adds something new . . . altering the first [work] with new expression, meaning or message," *Campbell*, 510 U.S. at 578-79, or uses the original work "in a different context such that" it "is transformed into a new creation," *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (quotation omitted). Works that are transformational "lie at the heart of the

48

fair use doctrine's guarantee of breathing space." *Campbell*, 510 U.S. at 579. By contrast, "an untransformed copy is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of fair use." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923 (2d Cir. 1994).

The first factor also considers whether or not an unauthorized use is "commercial." § 107(1).  Untransformed copies that are used commercially are especially likely to be "an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony*, 464 U.S. at 451; *Campbell*, 510 U.S. at 584-85.  Here, there is no question that DISH's copying is commercial and nontransformative.

The fourth fair use factor considers harm to the "potential market for or value of the copyrighted work," § 107(4), which includes harm to a market that a copyright owner "'would in general develop or license others to develop,'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145 (2d Cir. 1998) (quoting *Campbell*, 510 U.S. at 592).  "[W]hen a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the

49

original will occur." *Campbell*, 510 U.S. at 591 (alteration and quotation omitted).

In this case, DISH's nightly copying of ABC's entire primetime lineup for DISH's on-demand, commercial-free playback service obviously is intended to, and in fact does, act as a "market replacement." *Campbell*, 510 U.S. at 591. It replaces and unfairly "usurps," *Castle Rock*, 150 F.3d at 145, the market for the on-demand and commercial-free versions of primetime programs that ABC or its licensees distribute via distribution channels including VOD, Internet streaming, and commercial-free downloads. *See* pp. 8-9, 20-23, *supra*. DISH's copying also harms the value of ABC's copyrighted works by undermining the principal means by which ABC monetizes those works: advertising. JA1020, JA1419-23. Because DISH is offering a "substitute for the original," "usurp[s] . . . market[s] that properly belong[] to the copyright-holder," *Infinity Broad. Corp.*, 150 F.3d at 110, and harms the "value of the copyrighted work[s]," *Texaco*, 60 F.3d at 923, 926-27, its copying cannot be privileged as a fair use.

**Factors Two and Three:** Because ABC's copyrighted works are original, creative comedies and dramas at "the core of the copyright's protective purposes," *Campbell*, 510 U.S. at 586, and "the more of a

copyrighted work that is taken, the less likely the use is to be fair," *Infinity Broad. Corp.*, 150 F.3d at 109, the second and third factors also weigh heavily against DISH.

DISH's copying is, therefore, not a fair use.

**B.    DISH Cannot Show that Subscriber Use of Its Service Is a Fair Use**

Even if the only copying here were done by DISH's subscribers, that copying would not be a fair use.  In determining that such copying qualifies as a fair use, the district court made two legal errors.  First, the court concluded that subscriber copying is noncommercial because DISH subscribers have not "distributed, sold or exploited" the copies.  SPA15.  Second, the court failed to follow Supreme Court precedent that requires an inquiry into the present, and potential future, market harm caused by non-commercial uses.  SPA16.

**1.    Copying To Avoid Paying a Fee Is a Commercial Use**

A "commercial use [that] amounts to mere duplication of the entirety of [the] original" is likely to cause unfair market harm.  *Campbell*, 510 U.S. at 591.  Because PrimeTime Anytime/AutoHop's copying duplicates the entirety of ABC's original works, a finding that subscriber copying is commercial defeats the fair use defense, as demonstrated above.

To determine whether an unauthorized use is commercial, "a court should examine . . . the value obtained by the secondary user from the use of the copyrighted material." *Texaco*, 60 F.3d at 922. The "crux" of the question is "whether the user stands to profit from [the] exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. In the specific context of consumer copying, courts hold that making "unauthorized copies of copyrighted works . . . to save the expense of purchasing authorized copies" is a commercial use. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) (music downloads by consumers). In one example, where a defendant "encouraged" users "to download . . . games . . . to avoid having to buy video game cartridges," the court held that "the commercial purpose and character of the unauthorized copying weighs against a finding of fair use." *Sega Enters. Ltd. v. MAPHIA*, 857 F. Supp. 679, 687 (N.D. Cal. 1994).

DISH has encouraged just such unfair use. It admitted that it launched its service to compete with services like iTunes, which charge a fee to provide commercial-free versions of primetime shows. *See* p. 22, *supra*. It even advertised that "77% of Americans would pay to skip commercials" but that with "the Hopp[er] it comes included!" JA500. Because DISH

subscribers "save the expense" of paying for commercial-free versions of ABC's programs, *Napster*, 239 F.3d at 1015, the use is commercial.

### 2.    Whether Commercial or Noncommercial, Subscriber Use of DISH's Service Causes Unfair Market Harm

"While the fact that [copying] is commercial tends to weigh against fair use, the absence of commercial use merely eliminates the presumption of unfairness." *Worldwide Church of God v. Phil. Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000) (citing *Campbell*, 510 U.S. at 584). "The more critical inquiry under the first factor" remains whether the new work is transformative or, as is the case here, "merely supersedes the original work." *Castle Rock*, 150 F.3d at 142 (quotation omitted).

Accordingly, a finding that unauthorized copying is noncommercial does not lessen the need to conduct an investigation into market harm under the fourth factor. In *Sony*, the Supreme Court instructed that "[a] challenge to a noncommercial use of a copyrighted work requires proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work." 464 U.S. at 451. The *Sony* Court emphasized that "[a]ctual present harm need not be shown; such a requirement would leave the copyright holder with no defense against predictable damage. Nor," the Court said, "is it necessary to show

with certainty that future harm will result. What is necessary is a showing by a preponderance of the evidence that <u>some</u> meaningful likelihood of future harm exists." *Id.* (emphasis in original); *see also, e.g.*, *CEEB v. Pataki*, 889 F. Supp. 554, 568, 575 (N.D.N.Y. 1995) (notwithstanding defendants' "non-commercial use with laudable purposes," use was not fair because of potential harm to the value of plaintiff's copyrights).

The district court never undertook the required market-harm analysis. It cited its noncommercial-copying conclusion as a reason not to: "Finally, with respect to the fourth factor, DISH <u>subscribers</u> are not offering a substitute market for [ABC's copyrighted works] . . . . The fact that <u>DISH</u> might be developing such a market does not defeat fair use pro[te]ction of copying by DISH's <u>subscribers</u>." SPA16 (emphasis in original). But DISH subscribers do not have to <u>offer</u> ABC's works to others "to adversely affect the potential market" for the works. *Sony*, 464 U.S. at 451. The adverse effect here is twofold:

First, the copying here interferes with existing and growing markets for the distribution of ABC's programming. Creating an eight-day, on-demand library of all of ABC's primetime programs undermines authorized on-demand services. Copying those programs for commercial-free playback

54

undercuts authorized commercial-free platforms.  JA1020-25, JA1029.  If such conduct were to become widespread—that is, if large numbers of cable and satellite subscribers were provided with unlicensed, on-demand and commercial-free libraries of ABC's latest primetime shows—ABC's ability to continue licensing its programming to VOD, Internet streaming, and commercial-free download services would be greatly compromised.  JA1027-29.  In the words of DISH's own executive: "I don't think you'd ever need Hulu Plus or Hulu after this."  JA939.

Second, making PrimeTime Anytime/AutoHop copies in order to create "commercial-free TV" deprives ABC of its principal source of revenue from its copyrighted primetime programs.  It is not reasonably open to debate that consumers who can skip all commercials by responding to a single prompt will watch fewer commercials.  DISH itself promises that subscribers who use AutoHop will "save an hour each night!"  JA497.

It is undisputed that viewers watch a substantial and growing percentage of ABC primetime shows the next day or later, ███████████

███████████████████████████████████████████████████████

███████████████████  And it is undeniable that the effect of AutoHop is to reduce that figure to 0% each time it is deployed.  ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ If services like

PrimeTime Anytime/AutoHop were to become "widespread," *Sony*, 464 U.S.

at 451, they plainly would adversely affect ABC's primetime ratings, along

with the value of its copyrights, JA1421-22.

For these reasons, the challenged copying in this case cannot qualify as

a fair use, whether accomplished by DISH directly or indirectly.[8]

### 3. *Sony*'s Time-Shifting Ruling Does Not Support a Different Result

The district court equated the unauthorized copying here with the

time-shifting that occurred in *Sony*.  SPA15-16.  But in all of the respects

---

[8] In *Fox v. DISH*, the Ninth Circuit affirmed a ruling that subscribers' use of PrimeTime Anytime/AutoHop was noncommercial and a fair use.  723 F.3d at 1076.  But because the court mistakenly concluded that "the market harm that Fox . . . allege[s] results from the automatic commercial-skipping, not the recording of programs through PrimeTime Anytime," *id.*, the court declined to address the market harm caused by such copying.  This was error because the market harm here comes from both the unauthorized copying to create on-demand libraries that compete with licensed on-demand offerings and the unauthorized copying that DISH's commercial-skipping service uses to make the on-demand libraries commercial-free as well.

56

mentioned above, the copying here is fundamentally different from the time-shifting of individual programs that *Sony* approved as a fair use based on technology and market conditions in 1979 when that case's factual record closed.

The *Sony* Court specifically defined "'time-shifting'" as "the practice of recording a program to view it once at a later time, and thereafter erasing it." 464 U.S. at 423. This case, by contrast, involves the wholesale recording of the entire primetime schedules of four networks for on-demand, commercial-free viewing in direct competition with licensed, on-demand and commercial-free offerings. Markets for such services did not even exist in 1979, and the Court indicated that the existence of such markets should affect the analysis: "Some copyrights govern material with broad potential secondary markets. <u>Such material may well have a broader claim to protection because of the greater potential for commercial harm</u>." 464 U.S. at 455 n.40 (emphasis added). The copying here impacts material with just such broad secondary markets, which the *Sony* Court recognized deserves protection.

The commercial skipping here also "is harmful" to advertising revenue—or at a minimum will be if "it should become widespread"—in ways

57

that are fundamentally different from the fast-forwarding involved in *Sony*. 464 U.S. at 451.  Notably, in a section of the opinion explaining why other copyright holders did not object to the Betamax, the Court emphasized the critical importance to copyright owners of the ability to earn revenue from advertising: "The traditional method by which copyright owners capitalize upon the television medium—commercially sponsored free public broadcast over the public airwaves—is predicated upon the assumption that compensation for the value of displaying the works will be received in the form of advertising revenues." *Id.* at 446 n.28.

In the Court's view, use of the Betamax did not undermine advertising revenue precisely because it was not easy to fast-forward through commercials.  Quoting the district court's findings, the Court observed that fast-forwarding with a Betamax "may be too tedious" for "most recordings" to cause any meaningful harm.  464 U.S. at 452 n.36 (quotation omitted).  "To avoid commercials during playback," the Court explained, viewers would have to "fast-forward and, for the most part, guess as to when the commercial has passed." *Id.* (quotation omitted).  (With the Betamax technology at the time, the screen went black during fast-forwarding or rewind.)  With AutoHop, by contrast, no guess work is involved since DISH

58

skips over not only the <u>entire</u> commercial, but the entirety of <u>all</u> commercials in a given program. The copying here is done for a different purpose and is not remotely the equivalent of the time-shifting evaluated by the Court based on the markets for television programming as they existed 34 years ago.

## IV. ABC SHOWED THAT DISH IS BREACHING THE PARTIES' 2005 AGREEMENT

Section 12 of the parties' 2005 Agreement prohibits DISH from "record[ing], copy[ing], duplicat[ing], retransmit[ing] and/or authoriz[ing] the recording, copying, duplication, or retransmission of any portion of any Digital Signal without the prior written consent of Broadcaster." JA2967. Copying all of ABC's most valuable primetime programming constitutes a breach of Section 12 regardless of whether DISH is doing the copying itself or "authoriz[ing]" its subscribers to do so. JA2967.

The sole exception to Section 12's prohibition against copying is the clarification that DISH technicians may engage in the "practice of connecting subscribers' home recording devices such as VCRs or DVRs." JA2967. But DISH does more than connect subscribers' <u>devices</u>. It engages in nightly copying of all of ABC's primetime programming for the express purpose of supplying inventory for a commercial-skipping <u>service</u> that DISH operates

59

out of Cheyenne, Wyoming. Nothing in this limited exception can be remotely construed to apply to the ongoing operation of such a service.[9]

## V. ABC SHOWED THAT IT WOULD SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

To determine that a plaintiff "would suffer irreparable harm in the absence of a preliminary injunction," a court must find "harm to the plaintiff's legal interests that could not be remedied after a final adjudication." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012). "Harm may be irreparable where the loss is difficult to replace or measure, or where plaintiffs should not be expected to suffer the loss." *Id.* (citing *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010)).

Failing to cite or acknowledge this operative definition of irreparable harm, the district court instead asked only whether the harm alleged was sufficiently "actual and imminent." SPA18. Although ABC did establish actual and imminent harm, the court should have considered the applicable,

---

[9] The district court opined that ABC's position would lead to the "absurd" result that the contract permits connecting DVRs to TV sets, but not using them to record. SPA18 n.11. But that was not ABC's position. ABC explicitly acknowledged in its motion papers that Section 12 recognized that subscribers' use of DVRs was not prohibited.

broader standard.  The district court also failed to follow this Court's

guidance in *Salinger v. Colting* and *WPIX v. ivi* on how to apply the

standard in copyright infringement cases; the court cited neither case.

### A.    The *Salinger* Court Expected that Preliminary Injunctions Against Copyright Infringement Will Remain Commonly Available

In *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), the

Supreme Court rejected the application of categorical rules against or in

favor of injunctions as incompatible with "the four-factor test historically

employed by courts of equity."  *Id.* at 390, 393-94.  In *Salinger*, this Court

undertook a careful analysis of the impact of *eBay* on preliminary injunctions

in copyright cases.  607 F.3d at 79-82.  *Salinger* concluded that a

presumption of irreparable harm in copyright cases could not continue in

light of *eBay*.  *Id.* at 82.

*Salinger* emphasized, however, that the historical practice favoring

preliminary injunctions in copyright cases should still inform judges'

decisions.  607 F.3d at 82.  This is so because copyright is in part a right to

exclude, and courts have traditionally recognized "'the difficulty of protecting

a right to <u>exclude</u> through monetary remedies.'"  607 F.3d at 82 (emphasis in

original) (quoting *eBay*, 547 U.S. at 395 (Roberts, C.J., concurring)).

61

This Court therefore concluded that *eBay* did not mean that courts in this Circuit should reverse course on preliminary injunctions in copyright cases. To the contrary, this Court advised that "[a]s an empirical matter," it "may well be the case" that "<u>most</u> copyright plaintiffs who have shown a likelihood of success on the merits would . . . be irreparably harmed absent preliminary injunctive relief." 607 F.3d at 82 (emphasis added).

**B.    ABC Established that Absent an Injunction It Would Suffer Harm that Is Difficult To Measure or Replace**

The Second Circuit next addressed irreparable harm from copyright infringement in *WPIX v. ivi*, in which it affirmed a grant of a preliminary injunction against unauthorized Internet retransmissions of the signals of a group of television broadcasters (including ABC). 691 F.3d at 285. Like DISH here, ivi was engaging in unauthorized exploitation that competed directly with, and undermined, licensed uses of the plaintiffs' copyrighted works. *Id.* at 285-86.

This Court held in *WPIX v. ivi* that evidence of irreparable harm justifying a preliminary injunction included evidence that the unauthorized retransmissions would: (i) "dilute plaintiffs' programming and their control over their product," including by undermining the plaintiffs' windowing strategy; (ii) "devalue the programming by . . . undermining existing and

62

prospective . . . negotiations, and agreements"; and (iii) divert viewers from broadcasts whose ratings are measured, thus "weaken[ing] plaintiffs' negotiating position with advertisers and reduc[ing] the value of [their] local advertisements." 691 F.3d at 285-86. Defendant's unauthorized conduct, the Court reasoned, would result in "losses" to plaintiffs that "would be difficult to measure," losses that "monetary damages would be insufficient to remedy." *Id.* at 286. "Accordingly," the Court concluded, "plaintiffs would suffer irreparable harm without a preliminary injunction." *Id.* at 287. ABC identified precisely these harms here, and more, but the district court either ignored them or misapplied the law in dismissing them.

### 1.     Harm to ABC's Right to Exclusive Control of Its Copyrights

ABC's control over "when, where, to whom, and for how much" it will distribute its copyrighted works, *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012 (C.D. Cal. 2011), is an exercise of its "right to exclude," *Salinger*, 607 F.3d at 78, which is fundamental to its ability to maximize consumer choice, exposure, and total revenue. ABC exercises this control by releasing its primetime programming in different "windows," on different platforms and in different formats. JA1020-25.

By making unauthorized copies of ABC's primetime programming available on-demand and without commercials, DISH interferes with ABC's exclusive right to control the time and manner in which its programs are distributed.  JA969-70, JA1020-25, JA1029-30.  This is the same harm that this Court recognized as irreparable in *WPIX v. ivi*: "dilut[ing] plaintiffs' programming and their control over their product" by undermining a windowing strategy in which plaintiffs "typically delay Internet broadcasts as not to disrupt plaintiffs' broadcast distribution models."  691 F.3d at 285.

While the district court did not address this harm directly, it did opine that "[t]he number of venues to which ABC has licensed its programs and its licensing practices also make it clear that whatever harm may result is calculable and compensable with money damages."  SPA20.  This is wrong for three reasons.

First, such reasoning is what the *Salinger* Court warned against in noting the difficulty of protecting a "right to exclude," 607 F.3d at 82: if a copyright owner's authorized licensing of its works meant that infringers could exploit the copyright owner's works in any manner so long as they are prepared to pay damages later, then copyright owners would lose the ability to plan their works' distribution.  *See Jacobsen v. Katzer*, 535 F.3d 1373,

64

1381-82 (Fed. Cir. 2008) ("Copyright licenses are designed to support the right to exclude; money damages alone do not support or enforce that right.").  As the *WPIX v. ivi* district court emphasized, in a decision that this Court praised as "thorough and carefully considered," 691 F.3d at 278, "Defendants cannot seriously argue that the existence of thousands of companies who <u>legitimately</u> use plaintiffs' programming and pay full freight means that ivi's <u>illegal</u> and uncompensated use does not irreparably harm plaintiffs," 765 F. Supp. 2d 594, 619 (S.D.N.Y. 2011) (emphasis in original).

Second, DISH's unauthorized exploitation devalues the licenses that ABC's business partners pay for, undermining ABC's relationships and negotiating position.  *See* pp. 66-67, *infra*.  Third, ABC does not license to <u>anyone</u> the right to provide at no cost a next-day commercial-free VOD library of all of ABC's primetime shows—precisely because it is so harmful to its business model.  The uniqueness of DISH's offering is reflected in DISH's advertising that PrimeTime Anytime is "<u>the only way</u>" to get such an incredible array of programming on demand.  JA917 (emphasis added).  The uniquely harmful impact of DISH's service means the losses it causes cannot be measured or replaced with an after-the-fact license.

## 2. Harm to ABC's Ability To Promote Its Own Programming

The largest advertiser on ABC is ABC itself.  JA1423.  ABC typically runs multiple promotional spots in every primetime program, forgoing millions of dollars in potential advertising revenue every week because the most effective way for ABC to promote its new programs is to advertise on its own network.  JA1423.  All of ABC's promotional advertising is skipped with AutoHop.  It would be difficult to accurately measure this harm to the value of ABC's television programming.  Nor can ABC ever recoup the value it would have gained from promotions that AutoHop users never see.  ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

DISH's conduct is thus irreparably harming ABC in a way that is paradigmatically "difficult to replace or measure."  *WPIX v. ivi*, 691 F.3d at 285.  Although ABC's briefing highlighted the irreparable nature of this loss, the district court failed to address it in any way.

## 3. Harm to ABC's Negotiating Positions and Relationships with Licensees

DISH's conduct disrupts ABC's relationships with the licensed distributors that bargained for the right to distribute its programming through authorized channels.  JA1028-29.  ▮▮▮▮▮▮▮▮▮▮



The district court rejected ABC's evidence of this harm as "conclusory," SPA20,

And this Court accepted just such proof as evidence of irreparable harm, because of the difficulty of measuring the harm caused by "undermining existing and prospective . . . negotiations, and agreements" with licensees of these works.  *WPIX v. ivi*, 691 F.3d at 285-86.

### 4.    Harm to ABC's Ability To Earn Advertising Revenue

Advertising revenue from ABC's primetime programming accounts for

AutoHop threatens that revenue by eliminating commercial playback altogether.  JA1079-80, JA1421-22.

The district court was wrong to discount this loss on the basis that harm to ratings had not yet been shown, for at least two reasons. SPA19-20. First, in similar cases, harm to advertising revenues has been "accepted as irreparable based, at least in part, on the difficulty of proving or quantifying such damages." *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 398 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 676 (2d Cir. 2013). ███████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

### C.     DISH's Breach of Contract Should Be Enjoined

Based on the same harms, a preliminary injunction is also warranted for DISH's breach of contract. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). The court's conclusion that proving irreparable harm based on breach "is even more challenging, since the contracts at issue are fee-based," SPA21, was based on clear error. The parties' 2005 Agreement was <u>not</u> fee based: ABC relied instead on other benefits—such as advertising—that DISH's conduct thwarts. JA1026-27.

### D.     ABC Did Not Delay in Seeking Relief

Instead of asking whether the "harm to the plaintiff's legal interests" before trial was "difficult to replace or measure," *WPIX v. ivi*, 691 F.3d at 285, the district court applied only an "actual and imminent" harm test, SPA18.  The court then concluded that ABC's agreement to an expedited period for mutual discovery before filing its motion meant that ABC lacked the "urgency" needed for a preliminary injunction.  SPA21 (quoting Title IX case).  This was error.

In fact, in June 2012, six weeks after DISH launched AutoHop and fourteen weeks after it launched PrimeTime Anytime, ABC gave notice that it sought a preliminary injunction, and in July 2012 ABC and DISH negotiated an expedited schedule for preliminary injunction discovery and a November filing date for ABC's motion, which the court approved.  JA2924-26.[10]

Given that both the parties and the court agreed that an expedited period of mutual discovery was necessary for the preliminary injunction

---

[10] The district court found that PrimeTime Anytime was "introduced" in January 2012.  SPA6.  The service was only announced in January; it was released to the public on March 15, 2012.  JA798.

motion and its opposition, the district court should have recognized July at the latest as the date by which ABC sought preliminary relief, not November when ABC filed the motion after the agreed discovery.  Actively seeking a preliminary injunction mere weeks after the introduction of DISH's infringing service, ABC "did not unduly sleep on [its] rights."  *Aereo*, 874 F. Supp. 2d at 401 & n.13; *see also Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F. Supp. 2d 372, 390 (S.D.N.Y. 2003) ("It is reasonable—and not inconsistent with a showing of irreparable harm—for [plaintiff] to have waited until after the close of the three month discovery period to file its motion.").

## VI.   THE OTHER FACTORS SUPPORT A PRELIMINARY INJUNCTION

The district court did not address the remaining two preliminary injunction factors—the balance of harms and the public interest.  *WPIX v. ivi*, 691 F.3d at 278.  Both support an injunction.  ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████  DISH cannot otherwise complain about the injunction, because an infringer has no cognizable interest in continuing

70

to infringe. *See WPIX v. ivi*, 691 F.3d at 287. And an injunction benefits the public by upholding both copyright protection and the ad-supported model of free television on which millions of Americans rely. *See id.* at 287-88; *SBCA v. FCC*, 275 F.3d 337, 343 (4th Cir. 2001).

## CONCLUSION

For the reasons stated, the district court's denial of a preliminary injunction should be reversed.

Dated: November 12, 2013

Respectfully submitted,

/S/ KEVIN T. BAINE
KEVIN T. BAINE
THOMAS G. HENTOFF
STANLEY E. FISHER
WILLIAM J. VIGEN
JULIA H. PUDLIN
WILLIAMS & CONNOLLY LLP
  725 Twelfth Street, N.W.
  Washington, DC 20005
  (202) 434-5000
  kbaine@wc.com

71

# CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE
## <u>REQUIREMENT AND TYPE STYLE REQUIREMENTS</u>

I hereby certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,805 words (including words displayed in the foreground of images that are not readable by the Microsoft Word 2007 Word Count feature), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 and Century Expanded BT 14-point font.

Dated: November 12, 2013

/s/ Kevin T. Baine_____
Kevin T. Baine