# No. 13-3573-cv

## In the United States Court of Appeals for the Second Circuit

IN RE AUTOHOP LITIGATION

───────────────

DISH NETWORK L.L.C.,

*Plaintiff-Consolidated Defendant-*
*Counter Defendant-Appellee*,

v.

AMERICAN BROADCASTING COMPANIES, INC., ABC, INC.,
DISNEY ENTERPRISES, INC.,

*Defendants-Counter Claimants-Appellants*,

THE ABC ENTERTAINMENT GROUP, INC., ABC TELEVISION
HOLDINGS, INC., ABC CABLE NETWORK SERVICES, L.L.C.,

*Defendants*,

CBS CORPORATION, NBC UNIVERSAL MEDIA, L.L.C.,
SURVIVOR PRODUCTIONS LLC, CBS STUDIOS INC.,

*Defendants-Counter-Claimants*,

CBS BROADCASTING INC.,

*Counter-Claimant*,

ECHOSTAR TECHNOLOGIES, L.L.C.,

*Counter-Defendant*.

Appeal from the United States District Court
for the Southern District of New York

───────────────

**BRIEF FOR *AMICUS CURIAE* CABLEVISION SYSTEMS
CORPORATION IN SUPPORT OF APPELLANTS**

───────────────

Jeffrey A. Lamken
Robert K. Kry
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000

*Counsel for Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* Cablevision Systems Corporation states that it is a publicly held corporation with no parent corporation.  The following publicly held corporations own 10% or more of Cablevision Systems Corporation's stock: GAMCO Investors, Inc. and ClearBridge Investments, LLC (a wholly-owned subsidiary of Legg Mason, Inc.).

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTEREST OF *AMICUS CURIAE*...........................................................................1

ARGUMENT ........................................................................................................3

I. The District Court Properly Held That Dish Is Not a Direct Infringer ...........4

    A. *Cablevision* Limits Direct Infringement to Defendants Who "Do" the Copying................................................................................4

    B. Under *Cablevision*, Dish Is Not the One "Doing" the Copying ...........9

II. The District Court Erred in Rejecting ABC's Secondary Liability Claim................................................................................................16

    A. *Sony* Does Not Authorize Automatic Commercial-Skipping .............17

    B. *Sony* Does Not Authorize Indiscriminate Mass Copying of All Prime-Time Programming..................................................................22

    C. The Court Should Find Dish Secondarily Liable................................25

CONCLUSION .................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### CASES

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124
(S.D.N.Y. 2009) .................................................................................12

*Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640
(S.D.N.Y. 2013) ..........................................................................13, 14

*Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121
(2d Cir. 2008), *cert. denied*, 129 S. Ct. 2890 (2009)................................. *passim*

*CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004)....................7, 11

*Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303
(S.D. Fla. 2011)......................................................................................7

*Ellison v. Robertson*, 189 F. Supp. 2d 1051 (C.D. Cal. 2002),
*rev'd on other grounds*, 357 F.3d 1072 (9th Cir. 2004) .......................7

*Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006)...................................7

*Flava Works, Inc. v. Gunter*, No. 10 C 6517, 2011 WL 1791557
(N.D. Ill. May 10, 2011) ......................................................................7

*Fox Broad. Co. v. Dish Network LLC*, 723 F.3d 1067 (9th Cir. 2013) ....................7

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ...............25

*In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003) ................................17

*L.A. News Serv. v. Tullo*, 973 F.2d 791 (9th Cir. 1992)..........................................5

*Leonard v. Stemtech Health Scis., Inc.*, No. 08-67, 2013 WL 5288266
(D. Del. Sept. 19, 2013), *report and recommendation adopted*,
No. 08-67 (D. Del. Oct. 4, 2013) (docket #217).................................15

*Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*,
983 F. Supp. 1167 (N.D. Ill. 1997).....................................................7

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)............................................................................27

*Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181 (D.D.C. 2005)..................................7

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000)..........................................26

*Paramount Pictures Corp. v. ReplayTV*, 298 F. Supp. 2d 921
 (C.D. Cal. 2004)..............................................................................................22

*Parker v. Google, Inc.*, 242 F. App'x 833 (3d Cir. 2007) .......................................7

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146
 (C.D. Cal. 2002)...............................................................................................7

*Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503
 (N.D. Ohio 1997) .............................................................................................8

*Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543
 (N.D. Tex. 1997), *aff'd mem.*, No. 98-10097, 1999 WL 25053
 (5th Cir. Jan. 8, 1999) ...................................................................................12

*Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381
 (6th Cir. 1996) (en banc)..................................................................................5

*RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.*, 845 F.2d 773
 (8th Cir. 1988).................................................................................................5

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
 907 F. Supp. 1361 (N.D. Cal. 1995)..................................................................8

*Rosen v. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219 (C.D. Cal. 2010) ....................7

*Sega Enters. Ltd. v. MAPHIA*, 948 F. Supp. 923 (N.D. Cal. 1996).........................8

*Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963)............16

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29
 (1st Cir. 2012) ................................................................................................15

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
 464 U.S. 417 (1984).................................................................................. *passim*

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003
 (C.D. Cal. 2011)...............................................................................................8

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012)..............................................14

iv

*Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724
    (S.D.N.Y. 2012) ............................................................................7

*Xiu Xia Lin v. Mukasey*, 534 F.3d 162 (2d Cir. 2008) ............................26

## STATUTES

17 U.S.C. § 106(1) ...................................................................................4

17 U.S.C. § 107(1) .................................................................................19

17 U.S.C. § 107(4) .................................................................................27

17 U.S.C. § 501(a) ...................................................................................4

## OTHER AUTHORITIES

Daniel E. Abrams, Comment, *Personal Video Recorders, Emerging
    Technology and the Threat To Antiquate the Fair Use Doctrine*,
    15 Alb. L.J. Sci. & Tech. 127 (2004) .................................................17

Matthew W. Bower, Note, *Replaying the Betamax Case for the New
    Digital VCRs: Introducing TiVo to Fair Use*, 20 Cardozo Arts & Ent.
    L.J. 417 (2002) ...............................................................................17

*Channel Master CM-7000PAL DVR User Guide* (2010) .......................19

Compl. in *Paramount Pictures Corp. v. ReplayTV*, No. 01-09358
    (C.D. Cal. filed Oct. 31, 2001)..........................................................22

Decl. of David Singer, *Fox Broad. Co. v. Dish Network LLC*,
    No. 2:12-cv-04529 (C.D. Cal. filed Aug. 22, 2012) (docket #41-2).................24

Decl. of Robert D. Liodice, *Fox Broad. Co. v. Dish Network LLC*,
    No. 2:12-cv-04529 (C.D. Cal. filed Aug. 22, 2012) (docket #41-10)...............21

*DirecTV HD DVR Receivers User Guide* (2012) ...................................19

Dish, *AutoHop Quick Start Guide*, *available at*
    http://www.southernutahtv.com/files/DISH_Hopper-Auto-Hop.pdf.................20

Dish, *DISH Introduces Commercial-Free TV with "Auto Hop"*
(May 10, 2012), http://about.dish.com/category/press-release-
category/products-and-services ...........................................................24

Dish, *Equipment: Whole-Home Entertainment*, http://dishtv.com/
Technology/Equipment.........................................................................24

Leslie Ellis, *Definitive Broadband: Next Generation* (2005)..................................23

*Goldstein on Copyright* (3d ed. 2012) ........................................................4, 5, 8, 15

Bradley Hamburger, *Digital Video Recorders, Advertisement Avoidance,
and Fair Use*, 23 Harv. J.L. & Tech. 567 (2010) ................................17

Jesse Haskins, *Commercial Skipping Technology and the New Market
Dynamic: The Relevance of Antitrust Law to an Emerging Technology*,
2009 Duke L. & Tech. Rev. 6.................................................................17

Maribel Rose Hilo, Note, *TiVo and the Incentive/Dissemination Conflict:
The Economics of Extending Betamax to Personal Video Recorders*,
81 Wash. U. L.Q. 1043 (2003) .............................................................17

Meg James & Dawn C. Chmielewski, *Networks' Fight with Dish over
Ad-Skipping Has Huge Implications*, L.A. Times, May 25, 2012.....................21

Ted Johnson, *AutoHop and the Future of the 30-Second Spot*, Variety,
Nov. 16, 2012........................................................................................21

Josh Lerner, Harvard Business School, *The Impact of Copyright Policy
Changes on Venture Capital Investment in Cloud Computing
Companies* (2011) ................................................................................11

Peter H. Lewis, *State of the Art: Making Television Searchable*,
N.Y. Times, Apr. 22, 1999 ...................................................................19

MythTV, *In Detail* (2012), http://www.mythtv.org/detail/mythtv..........................22

*Nimmer on Copyright* (2012)..........................................................................4, 5, 9

Ethan O. Notkin, Note, *Television Remixed: The Controversy over
Commercial-Skipping*, 16 Fordham Intell. Prop. Media & Ent.
L.J. 899 (2006)......................................................................................17

*Patry on Copyright* (2012)......................................................................4

Randal C. Picker, *The Digital Video Recorder: Unbundling Advertising and Content*, 71 U. Chi. L. Rev. 205 (2004) .......................................17

*Prosser & Keeton on Torts* (5th ed. 1984)..............................................16

Scientific Atlanta, *Getting Started with the Explorer 8300 and 8300HD DVR* (2004) ...............................................................................19

Ned Snow, *The TiVo Question: Does Skipping Commercials Violate Copyright Law?*, 56 Syracuse L. Rev. 27 (2005) ...............................17

*TiVo Primiere/Premiere XL Viewer's Guide: Remote Control Tips* (2012) ...........19

*What Is Auto Hop, and Should Advertisers Be Worried?*, MayoSeitz Media Monitor, May 30, 2012..........................................................21

## INTEREST OF *AMICUS CURIAE*[1]

Cablevision Systems Corporation provides cable television service in the New York metropolitan area and elsewhere. Pursuant to license agreements with television networks and other content providers, it distributes copyrighted materials over its cable system. Cablevision also developed the Remote Storage Digital Video Recorder ("RS-DVR") that this Court upheld against a copyright challenge in *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 2890 (2009) ("*Cablevision*"). The RS-DVR allows each subscriber to record television programs he is entitled to watch over cable as they air—just as he could with a VCR or traditional set-top DVR. Each subscriber can then play back his own personal recordings for private viewing—again just as he could with a VCR or set-top DVR. Unlike those earlier technologies, however, the RS-DVR stores the subscriber's recordings remotely on Cablevision's premises. Cablevision began offering the RS-DVR to its subscribers in January 2011.

Cablevision has a strong interest in this case. The district court relied squarely on this Court's *Cablevision* decision in upholding the lawfulness of Dish's PrimeTime Anytime ("PTAT") feature. Because Cablevision currently

---

[1] All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or part; no such party or counsel made a monetary contribution intended to fund its preparation or submission; and no person other than Cablevision made such a contribution.

operates the system this Court upheld, it has a direct interest in the proper interpretation of that decision. Moreover, this case implicates a complex marketplace with rapidly evolving technologies. Cablevision both provides cutting-edge technologies that subscribers use to make fair-use copies and pays license fees to copyright holders to distribute content over its cable system. For that reason, Cablevision has a unique—and uniquely balanced—perspective.

Cablevision has participated as *amicus curiae* in several other cases where companies invoked the *Cablevision* decision, including the related AutoHop litigation currently pending before the Ninth Circuit en banc. *See* Brief for Cablevision Systems Corp. in *Fox Broad. Co. v. Dish Network LLC*, No. 12-57048 (9th Cir. filed Dec. 20, 2012); *see also WNET v. Aereo, Inc.*, No. 12-2786 (2d Cir. filed Sept. 21, 2012); *Fox Television Stations, Inc. v. FilmOn X, LLC*, No. 13-55156 (9th Cir. filed May 3, 2013); *Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, No. 2:11-cv-02817 (C.D. Cal. filed July 18, 2011).

In this case, Cablevision agrees with the district court's holding that, by offering PTAT, Dish does not engage in any volitional conduct sufficient to make it a direct infringer. On the other hand, the court erred in rejecting ABC's secondary liability claim. ABC has made strong showings that subscribers have no fair use right to engage in indiscriminate mass copying of all prime-time programming and then automatically skip commercials upon playback, and that Dish is secondar-

2

ily liable for that infringement. The Court should thus affirm the district court's direct infringement ruling but reverse its secondary liability ruling.

## ARGUMENT

As this Court explained in *Cablevision*, direct and indirect infringement are complementary components of the Copyright Act that work together to produce a balanced regime. Courts must "maintain a meaningful distinction" between the two. *Cablevision*, 536 F.3d at 133. Far from undermining the legitimate interests of content owners, restricting the strong medicine of direct infringement to its traditional scope simply allows secondary liability doctrines to fulfill their appropriate role. "[T]o the extent that [a court] may construe the boundaries of direct liability more narrowly, the doctrine of contributory liability stands ready to provide adequate protection to copyrighted works." *Id.* at 132.

This case illustrates the wisdom of that approach. PTAT and AutoHop undermine the legitimate interests of content owners, but secondary liability provides ample recourse. Direct infringement need not and should not be stretched to reach those features.

The district court properly adhered to those principles when it rejected ABC's direct infringement claim. A defendant directly infringes only if it "does" the infringing act, not if it merely supplies technology or content that others use to

infringe.  By offering PTAT, Dish does not engage in any volitional conduct suffi-cient to make it the one that "does" the copying.

The district court went astray, however, in rejecting ABC's secondary liabil-ity claim.  Nothing in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), authorizes consumers to engage in indiscriminate mass copying of all prime-time programming and then automatically skip commercials on play-back.  ABC has made a strong showing that Dish is secondarily liable.

## I.    THE DISTRICT COURT PROPERLY HELD THAT DISH IS NOT A DIRECT INFRINGER

### A.    *Cablevision* Limits Direct Infringement to Defendants Who "Do" the Copying

The Copyright Act grants authors exclusive rights "to do" six enumerated acts, including "to reproduce the copyrighted work in copies."  17 U.S.C. § 106(1).  A person who actually "does" one of those six acts without permission or exemp-tion is a direct infringer.  *See id.* § 501(a); 7 *Patry on Copyright* § 25:87 (2012).  By contrast, "parties who have not themselves engaged in the infringing activity" are subject to secondary liability.  *Sony*, 464 U.S. at 435.  Providing the "means" to infringe—such as the equipment another person uses to make copies—is one example of secondary liability.  *See* 3 *Nimmer on Copyright* § 12.04[A][3][b] (2012); 2 *Goldstein on Copyright* § 8.1.2.1 (3d ed. 2012).  Providing the content

4

that gets copied is another.  *See* 3 *Nimmer on Copyright* § 12.04[A][3][b]; 2 *Gold-stein on Copyright* § 8.0.

The Copyright Act's text and basic structure thus compel a distinction between persons who actually make copies themselves and persons who merely provide the means or content that others use to make copies.  Common experience bears that distinction out.  If a customer walks into a full-service copy shop and asks a human employee to photocopy a document for him, it is natural to think of the employee as the one "doing" the copying.  *See Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1384 (6th Cir. 1996) (en banc); *RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.*, 845 F.2d 773, 781 (8th Cir. 1988).  By contrast, if a customer walks into a ***self-service*** copy shop and uses a self-service photocopier to make a copy himself, no one would say that the copy shop "does" the copying.  The copy shop might be secondarily liable for providing the ***means*** to copy, but it does not ***do*** the copying; the customer does.  *See Cablevision*, 536 F.3d at 131.  The same holds true for a library that offers both books and self-service photocopiers.  No one would say the library "does" the copying merely because a patron uses the library's photocopier to duplicate pages from a library book.  *See* 3 *Nimmer on Copyright* § 12.04[A][3][b].

Recording of television programs is another example.  If a news clipping service's employees record programs for sale to the public, the clipping service

"does" the copying and may be held directly liable.  *See L.A. News Serv. v. Tullo*, 973 F.2d 791 (9th Cir. 1992).  But where a company merely provides the means for consumers to record programs—as when Sony sold the Betamax VCR—the consumer "does" the copying, and the manufacturer is at most secondarily liable. *See Cablevision*, 536 F.3d at 131; *Sony*, 464 U.S. at 434-42.  The same is true for a cable company that offers both set-top DVRs and cable service.  Even though the company furnishes both the copying equipment and the content, it does not "do" the copying when a subscriber uses his set-top DVR to record a show.  *See Cablevision*, 536 F.3d at 132.

This Court relied on those common-sense distinctions when it upheld the RS-DVR.  Cablevision's employees "design[ed], hous[ed], and maintain[ed]" the RS-DVR, but volition in providing a copying *system* is not volition in actually *making the copies*.  *Cablevision*, 536 F.3d at 131.  As with a VCR, "the person who actually presses the button to make the recording[] supplies the necessary element of volition" in making the copy, "not the person who manufactures, maintains, or . . . owns the machine."  *Id.*

This Court left open the possibility that "one's contribution to the creation of an infringing copy may be so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy."  536 F.3d at 133.  But if such a rare exception existed, the Court held, it did not apply

there. Cablevision's role in delivering cable programming was not "sufficiently proximate to the copying to displace the customer as the person who 'makes' the copies." *Id.* at 132. Consumers could record any scheduled program on any channel to which they subscribed. *See id.* at 125. Cablevision had "no control over what programs are made available on individual channels or when those programs will air, if at all." *Id.* at 132. And Cablevision made the same channels available whether the subscriber used the RS-DVR, a set-top DVR, a VCR, or no recording device at all. *See id.* Cablevision's limited role in selecting channels did not bring the case within the extreme exception the court hypothesized.

Courts across the country have endorsed that volition standard. *See, e.g.*, *Fox Broad. Co. v. Dish Network LLC*, 723 F.3d 1067, 1073-74 (9th Cir. 2013) (petition for rehearing en banc pending); *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 548-52 (4th Cir. 2004); *Parker v. Google, Inc.*, 242 F. App'x 833, 836-37 (3d Cir. 2007) (unpublished).[2] Respecting that line between direct and indirect

---

[2] *See also Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 741-43 (S.D.N.Y. 2012); *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1307-10 (S.D. Fla. 2011); *Flava Works, Inc. v. Gunter*, No. 10 C 6517, 2011 WL 1791557, at *2-3 (N.D. Ill. May 10, 2011); *Rosen v. Hosting Servs., Inc.*, 771 F. Supp. 2d 1219, 1221-22 (C.D. Cal. 2010); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006); *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 186 n.3 (D.D.C. 2005); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1167-69 (C.D. Cal. 2002); *Ellison v. Robertson*, 189 F. Supp. 2d 1051, 1056-57 (C.D. Cal. 2002), *rev'd on other grounds*, 357 F.3d 1072 (9th Cir. 2004); *Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*, 983 F. Supp. 1167, 1178 (N.D. Ill.

infringement is critical.  Direct infringement is a strict-liability offense.  2 *Gold-stein on Copyright* §9.2.  By contrast, secondary liability permits a court to consider such factors as the defendant's lack of knowledge, potential non-infringing uses of the defendant's system, and the fair use rights of consumers who use the system (not just those of the defendant itself).  *See id.* §8.0; *Sony*, 464 U.S. at 432-34, 442.  Secondary liability is thus a robust but flexible doctrine that enables courts to hold accountable defendants who promote copyright piracy while allowing innovative technologies that facilitate ***lawful*** consumer copying to flourish.

Expanding direct infringement beyond its traditional bounds would have far-reaching consequences.  Entire product lines have been built in reliance on *Cablevision*'s holding.  *See, e.g.*, Josh Lerner, Harvard Business School, *The Impact of Copyright Policy Changes on Venture Capital Investment in Cloud Computing Companies* 1 (2011) (finding that "the *Cablevision* decision led to additional incremental investment in U.S. cloud computing firms that ranged from $728 million to approximately $1.3 billion over the two-and-a-half years after the decision").  Online businesses that allow consumers to store, manipulate, or transmit data could not survive if they were strictly liable every time a consumer used the

1997); *Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 512-13 (N.D. Ohio 1997); *Sega Enters. Ltd. v. MAPHIA*, 948 F. Supp. 923, 931-32 (N.D. Cal. 1996); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1368-70 (N.D. Cal. 1995).  *But see Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1011 n.7 (C.D. Cal. 2011).

service to commit an infringing act.  *Cablevision* is thus not only settled law in this circuit but also a cornerstone of technological innovation nationwide.

### B.    Under *Cablevision*, Dish Is Not the One "Doing" the Copying

The district court properly held that Dish is not a direct infringer under *Cablevision*.  Dish undeniably exercises a degree of discretion over the copying process beyond what was present in *Cablevision*.  But the district court correctly concluded that those differences do not justify a different result.

1.    ABC first points to Dish's role in selecting the channels and time segments to make available for copying.  ABC Br. 36-37.  That role is indeed different from Cablevision's role in offering the RS-DVR.  Cablevision chooses what channels to carry on its cable system, but those decisions are made for reasons unrelated to the RS-DVR.  By contrast, Dish's employees selected particular channels **and time segments** to make available, and they did so for the specific purpose of making them available for copying.

Nevertheless, those differences do not make Dish a direct infringer.  Selecting the content that another person copies is a basis for **secondary** liability, not direct infringement.  *See Cablevision*, 536 F.3d at 132 (Cablevision's "control over recordable content . . . seem[s] to us more relevant to the question of contributory liability"); 3 *Nimmer on Copyright* § 12.04[A][3][b] ("One who furnishes a copyrighted work to another, who in turn wrongfully copies from that work, may be

liable as a contributory infringer . . . .").  Dish's control over content may strengthen the case for secondary liability, but it has no bearing on whether Dish "does" the copying so as to make it a direct infringer.

Like Cablevision, moreover, Dish does not control what programs air on the channels it makes available for copying, nor does it control which of those channels a subscriber chooses to record.  This Court refused to find Cablevision a direct infringer even though Cablevision "control[led] . . . the channels of programming available to a customer" and could "modify the system to limit the number of channels available" for recording.  *Cablevision*, 536 F.3d at 125, 132.  For similar reasons, Dish is not a direct infringer here.

2.    ABC also complains that PTAT prohibits a subscriber from canceling a recording that is about to begin or in progress, or from deleting a recording during the first two days after it is made.  ABC Br. 37.  But those limitations are wholly ***automated*** constraints imposed by PTAT's programming; they do not reflect any ongoing volitional conduct by Dish ***employees***.  Dish's employees may have engaged in volitional conduct in deciding to design those constraints into the system architecture in the first place, but volition in designing and building a copying ***system*** is not volition in ***making the copy***.  *See Cablevision*, 536 F.3d at 131.  If a self-service copy shop disabled the "cancel" buttons on its photocopiers

so customers could no longer abort copy jobs partway through, no one would think that made the copy shop the one "doing" the copying. This case is no different.

The fact that PTAT prohibits deletion for two days is especially irrelevant. Deletion is not an infringing act, nor is preventing someone from deleting a copy. Thus, restrictions on when someone can delete a copy have no conceivable bearing on who "does" the copying. *Cf. CoStar*, 373 F.3d at 547 (service provider not directly liable even though its employees manually deleted certain copies).

3. ABC also complains that Dish exercises ongoing control over the copying process by making weekly decisions about when prime time begins and ends each night, potentially extending the window to cover programming such as the Olympics. ABC Br. 38-39. The district court determined that there was a factual dispute over whether this process occurred through operation of software or through human review of program schedules, but declined to resolve the dispute on the ground that Dish was not a direct infringer either way. Dist. Ct. Op. at 12-13.

If adjustments to the prime-time window are simply an automated feature of Dish's PTAT software, they clearly do not render Dish a direct infringer. ABC asserts that the conduct is not "any less volitional" merely because Dish acts "via software rather than manually." ABC Br. 39. But that is the very argument this Court rejected in *Cablevision*: "In determining who actually 'makes' a copy," the Court held, "a significant difference exists between making a request to a human

11

employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct." 536 F.3d at 131. The same is true here. Dish does not "do" any copying merely because, when a consumer uses PTAT to record prime-time programming on particular channels, the system uses preset algorithms to determine when prime time begins and ends each night.[3]

On the other hand, if Dish employees are manually adjusting the prime-time window based on a human review of programming schedules each week, that fact would substantially distinguish this case from *Cablevision*—particularly where the employees engage in that conduct ***after*** the consumer uses the system to schedule his recordings. Nonetheless, on the facts of this case, that conduct still is not sufficient to make those employees the ones "doing" the copying. The consumer, not the employees, decides what prime-time channels to record and uses the system to record those channels. The possibility that Dish employees may have some

_____

[3] ABC's handful of non-binding cases are not to the contrary. For example, *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009), found volition only because the defendant had taken "active steps, including both automated filtering ***and human review*****."** *Id.* at 148 (emphasis added). And *Playboy Enterprises, Inc. v. Webbworld, Inc.*, 991 F. Supp. 543 (N.D. Tex. 1997), *aff'd mem.*, No. 98-10097, 1999 WL 25053 (5th Cir. Jan. 8, 1999), involved a defendant who used automated software to make copies without any intervention by anyone else at all. *See id.* at 552 (defendant "us[ed] the ScanNews software to troll the Usenet for Webbworld's product").

minor role in ensuring that the system properly carries out the consumer's com-mands is not sufficient to displace the consumer as the one "doing" the copying.

4.  ABC invokes this Court's suggestion in *Cablevision* that "one's contribution to the creation of an infringing copy may be so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy."  536 F.3d at 133.  Although this Court left open that possibility, it should now make clear that no such exception exists.  The direct infringer is the one who actually "does" the copying—not someone who merely "contribut[es]," however "great[ly]," to another person's copying.  Contributions to copying are relevant to ***contributory*** infringement and other secondary liability doctrines.  But they do not make the defendant the one who "does" the copying.

ABC points to *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013), as a case applying that exception.  But far from justifying ABC's position, that case illustrates why the exception is both ill-advised and unnecessary.  In *ReDigi*, the defendant provided software that scanned a user's hard drive for copyrighted iTunes songs; the user could then choose to upload those songs to a remote server where they could be transferred to others.  934 F. Supp. 2d at 645-46.  The district court ruled that "[t]he fact that ReDigi's founders programmed their software to choose copyrighted content satisfies the volitional conduct re-

13

quirement and renders ReDigi's case indistinguishable from those where human review of content gave rise to direct liability." *Id.* at 657.

That holding was incorrect. As already noted, there is a fundamental difference between ongoing human judgment and automated restrictions imposed by the system's design—that is *Cablevision*'s essential holding. That ReDigi designed its software to target copyrighted songs is highly relevant to ***secondary liability*** because it shows that ReDigi set out to induce infringement by subscribers. And indeed, ReDigi was found secondarily liable on multiple grounds, making the court's direct infringement ruling wholly unnecessary. 934 F. Supp. 2d at 658-60. But that system limitation does not make ReDigi the one "doing" the copying when a subscriber ultimately chooses to upload a file. *ReDigi* was wrongly decided on that point and should not be followed.[4]

5.    Finally, ABC urges that two or more persons may be jointly liable as direct infringers. ABC Br. 41-42. That argument is a strawman. No one disputes that multiple individuals may be joint direct infringers ***so long as each of them***

---

[4] *ReDigi* also purported to distinguish *Cablevision* on the ground that ReDigi's software targeted copyrighted songs whereas Cablevision "offered a mix of protected and public television." 934 F. Supp. 2d at 657. In reality, no significant portion of television programming is in the public domain, even on "public television" stations like PBS (which is why PBS routinely appears as a copyright plaintiff, *see, e.g.*, *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012)). *Cablevision* never suggested that its holding depended on the supposed availability of public domain programming on Cablevision's cable system, nor does that supposed availability have any conceivable relevance to the Court's volition analysis.

*engages in the infringing act*—*i.e.*, "does" the copying. *See, e.g.*, 2 *Goldstein on Copyright* § 8.0 ("When a musical group performs a copyrighted work in public, each member of the group will directly infringe the public performance right . . . ."). *Cablevision* simply makes clear that volition in designing and maintaining a copying system, or volition in providing the content that gets copied, is not the same as volition in actually *making* the copy. The reason Dish is not a direct infringer is that Dish does not "do" the copying—not that it does *less* copying than the subscriber does.

ABC cites *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012), but that case is irrelevant. *Gregory* relied on agency principles to hold the defendant liable for acts of his subordinate. *See id.* at 56 ("[A] principal (here, the Archbishop) may be held liable for the authorized acts of its agent (here, Father Peter)."). Directing another *person* to infringe is not the same as providing a *machine*: A full-service copy shop owner may be presumptively liable for the acts of his employees, but a self-service copy shop owner is not similarly liable for the automated acts of his photocopiers. *See Cablevision*, 536 F.3d at 131. ABC ignores that basic distinction.[5]

---

[5] *Gregory*'s agency theory would be better classified as a species of indirect rather than direct liability. *See Leonard v. Stemtech Health Scis., Inc.*, No. 08-67, 2013 WL 5288266, at *7 n.7 (D. Del. Sept. 19, 2013), *report and recommendation adopted*, No. 08-67 (D. Del. Oct. 4, 2013) (docket #217) (observing that most

In short, while ABC identifies various differences between PTAT and the RS-DVR, it cannot explain why those differences make Dish the one who "does" the copying. The district court properly rejected the direct infringement claim.[6]

## II. THE DISTRICT COURT ERRED IN REJECTING ABC'S SECONDARY LIABILITY CLAIM

While the district court correctly rejected ABC's direct infringement claim, it went astray on the secondary liability claim. The court rejected that claim based on *Sony*'s holding that consumers have a fair use right to use VCRs to record

---

courts "appl[y] agency principles in the context of copyright law to **secondary** liability for infringement, not direct liability," and identifying *Gregory* as the sole exception); *cf. Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307-08 (2d Cir. 1963). However characterized, the relevant point is that the *respondeat superior* standard governing liability for one's employees clearly is not the same as the volition standard governing liability for one's machines.

[6] In a footnote, ABC debates the Ninth Circuit's interpretation of a passage from *Prosser & Keeton on Torts* (5th ed. 1984) addressing proximate cause. ABC Br. 43 n.7. In fact, both ABC and the Ninth Circuit misconstrue that passage. The proximate-cause standard is **not** the test for separating direct from indirect infringement. It is the test for separating liability from **no liability at all**. *See Cablevision*, 536 F.3d at 132 (citing this passage from *Prosser & Keeton* for the "contours of the Supreme Court's doctrine of **contributory** liability" (emphasis added)). Equating *Cablevision*'s volition standard with proximate cause would upend the law. A defendant who has not proximately caused any copying should not be held liable **on any theory**, direct or indirect. (This Court's reference to acts not being "sufficiently proximate to the copying to displace the customer as the person who 'makes' the copies" was **not** a reference to proximate cause. *See id.* It was a reference to the possibility that one's contribution to copying could be so great that one could be **deemed** the copier "even though another party has actually made the copy." *Id.* at 133.)

16

television programs for later viewing.  But this case goes well beyond anything *Sony* authorizes.

### A.    *Sony* **Does Not Authorize Automatic Commercial-Skipping**

Dish's AutoHop feature lets viewers automatically skip commercials when playing back a recording.  That ability to avoid commercials is relevant to the fair-use status of the copying because broadcast television is largely financed by advertisers.  *See In re Aimster Copyright Litig.*, 334 F.3d 643, 647-48 (7th Cir. 2003).  Commercial-skipping reduces the attractiveness of television as an advertising medium and thereby diminishes the amount advertisers are willing to pay.  It also hinders the development of alternative distribution media:  Consumers are unlikely to pay a premium for commercial-free versions of programs if they can get the same effect with their DVRs.[7]

---

[7] For some of the extensive legal literature on advertisement avoidance and fair use, see Bradley Hamburger, *Digital Video Recorders, Advertisement Avoidance, and Fair Use*, 23 Harv. J.L. & Tech. 567 (2010); Jesse Haskins, *Commercial Skipping Technology and the New Market Dynamic: The Relevance of Antitrust Law to an Emerging Technology*, 2009 Duke L. & Tech. Rev. 6; Ethan O. Notkin, Note, *Television Remixed: The Controversy over Commercial-Skipping*, 16 Fordham Intell. Prop. Media & Ent. L.J. 899 (2006); Ned Snow, *The TiVo Question: Does Skipping Commercials Violate Copyright Law?*, 56 Syracuse L. Rev. 27 (2005); Randal C. Picker, *The Digital Video Recorder: Unbundling Advertising and Content*, 71 U. Chi. L. Rev. 205 (2004); Daniel E. Abrams, Comment, *Personal Video Recorders, Emerging Technology and the Threat To Antiquate the Fair Use Doctrine*, 15 Alb. L.J. Sci. & Tech. 127 (2004); Maribel Rose Hilo, Note, *TiVo and the Incentive/Dissemination Conflict: The Economics of Extending Betamax to Personal Video Recorders*, 81 Wash. U. L.Q. 1043 (2003); Matthew

*Sony* recognized the relevance of advertisement avoidance. The Court specifically addressed the argument that "commercial attractiveness of television broadcasts would be diminished because Betamax owners would use the pause button or fast-forward control to avoid viewing advertisements." 464 U.S. at 452 n.36. Quoting the district court's findings, however, it found no evidence that commercial avoidance with VCRs would be sufficiently widespread or effective to undermine advertising as a revenue source:

> "[T]o omit commercials, Betamax owners must view the program, including the commercials, while recording. To avoid commercials during playback, the viewer must fast-forward and, for the most part, guess as to when the commercial has passed. For most recordings, either practice may be too tedious. As defendants' survey showed, 92% of the programs were recorded with commercials and only 25% of the owners fast-forward through them. Advertisers will have to make the same kinds of judgments they do now about whether persons viewing televised programs actually watch the advertisements which interrupt them."

*Id.* at 452-53 n.36. The Court thus assumed that commercial avoidance was relevant, but rejected the content owners' claim based on the particular technology and consumer habits at issue.[8]

---

W. Bower, Note, *Replaying the Betamax Case for the New Digital VCRs: Introducing TiVo to Fair Use*, 20 Cardozo Arts & Ent. L.J. 417 (2002).

[8] It may seem counterintuitive that the fair-use status of a consumer's act of ***copying*** a program could depend on his ***later*** decision to fast-forward through advertisements when playing it back. The consumer may not even know whether he plans to fast-forward through advertisements when he records a program. But the fair-use status of copying often depends on the later use to which a copy is put. A

Avoidance is, of course, a matter of degree. Even before VCRs, consumers could avoid advertisements by going to the bathroom, channel-surfing, or simply averting their eyes. And if it was once "too tedious" to fast-forward through commercials, today's DVRs permit consumers to zip through ads at various speeds. *See, e.g.*, Scientific Atlanta, *Getting Started with the Explorer 8300 and 8300HD DVR* 8 (2004) (offering "three different speeds of rewind or fast-forward"). Many DVRs also include a "30-second skip" feature that permits users to advance a program by 30 seconds, the length of a standard commercial.[9] Those features have been on the market for essentially as long as DVRs themselves.[10] Despite that history, no one has ever sued over those features, suggesting a high degree of industry consensus that they are lawful.

---

consumer might photocopy a document but not decide until later whether to use the copy for academic study or commercial purposes. 17 U.S.C. § 107(1).

[9] *See, e.g.*, *TiVo Premiere/Premiere XL Viewer's Guide: Remote Control Tips* (2012) ("Press ADVANCE to move forward 30 seconds."); *DirecTV HD DVR Receivers User Guide* 12 (2012) (advance button "[j]umps ahead in recorded or live-stored video by 30 seconds"); *Channel Master CM-7000PAL DVR User Guide* 15 (2010) ("Press SKIP FORWARD to jump ahead by 30 seconds in the program.").

[10] ReplayTV offered a 30-second skip feature known as "Quick-Skip" on its earliest models in 1999, two years before its ill-fated decision to enable automatic commercial-skipping, discussed below. *See* Peter H. Lewis, *State of the Art: Making Television Searchable*, N.Y. Times, Apr. 22, 1999 ("ReplayTV's remote control [has] a button that advances the show precisely 30 seconds, which just happens to be the length of the average television commercial.").

Those widely accepted features, however, differ fundamentally from automatic commercial-skipping features like AutoHop.  Fast-forward and 30-second skip require the viewer to take affirmative steps each time an advertisement airs in order to avoid it.  Common experience teaches that viewers will often neglect to take those steps or not bother to do so.  Even when the viewer does use fast-forward or 30-second skip, he still sees glimpses of each advertisement and can choose whether to watch an advertisement if it interests him.

AutoHop, by contrast, all but eliminates the viewer's exposure to advertisements.  In the words of Dish's own user guide, AutoHop is "not like fast-forwarding" because, once the viewer enables the feature, he can "put the remote control down."  Dish, *AutoHop Quick Start Guide* 1, *available at* http://www.southernutahtv.com/files/DISH_Hopper-Auto-Hop.pdf.  AutoHop thus makes commercial avoidance both extremely effective and practically effortless.  Unlike with fast-forward or 30-second skip, moreover, the viewer is not exposed even to glimpses of most advertisements and thus cannot be expected to stop and watch advertisements that interest him.[11]

---

[11] Even with AutoHop, users may see the first few seconds and last few seconds of the commercial break.  But all advertisements other than the first and last are eliminated entirely.  More importantly, once the viewer has "put the remote control down," he is much less likely to choose to view an advertisement upon seeing a glimpse of it.

Advertisers thus recognize that AutoHop is meaningfully different from fast-forward or 30-second skip.  As the president of the Association of National Advertisers has explained:   "With fast-forwarding, a consumer still sees some of the commercials and can stop when they see a commercial of interest.  These impressions, even when a consumer does not elect to stop and view an entire commercial, are important and valuable to advertisers."  Decl. of Robert D. Liodice, *Fox Broad. Co. v. Dish Network LLC*, No. 2:12-cv-04529, ¶ 6 (C.D. Cal. filed Aug. 22, 2012) (docket #41-10).  Press commentary has made similar points:  "The networks weathered the VCR and DVR but, even in fast forward, there is at least some exposure to the sponsors.  Not so with AutoHop."  Ted Johnson, *AutoHop and the Future of the 30-Second Spot*, Variety, Nov. 16, 2012; *see also What Is Auto Hop, and Should Advertisers Be Worried?*, MayoSeitz Media Monitor, May 30, 2012 (AutoHop is "far different . . . and perhaps more worrisome for advertisers"); Meg James & Dawn C. Chmielewski, *Networks' Fight with Dish over Ad-Skipping Has Huge Implications*, L.A. Times, May 25, 2012 ("[DVR users] for years have had the ability to fast-forward through commercials of shows they record.  But the AutoHop feature goes further.").

The history of automatic commercial-skipping confirms that the industry perceives it to be very different from fast-forward or 30-second skip.  Automatic commercial-skipping technology is not new.  ReplayTV offered the feature on its

21

DVRs in 2001, only two years after DVRs were introduced to the market. Content owners promptly sued, and the company was driven into bankruptcy. *See* Compl. in *Paramount Pictures Corp. v. ReplayTV*, No. 01-09358 (C.D. Cal. filed Oct. 31, 2001); *Paramount Pictures Corp. v. ReplayTV*, 298 F. Supp. 2d 921, 923 (C.D. Cal. 2004) (recounting procedural history). Since then, no major DVR provider has offered automatic commercial-skipping until Dish did so here.[12] That history suggests an industry consensus that, while fast-forward and 30-second skip are lawful, automatic commercial-skipping probably is not.

### B. *Sony* Does Not Authorize Indiscriminate Mass Copying of All Prime-Time Programming

Even apart from AutoHop, PTAT strays beyond *Sony* by allowing consumers to engage in indiscriminate mass copying of all prime-time programming. *Sony* upheld the VCR because it was capable of the substantial non-infringing use of consumer time-shifting. 464 U.S. at 442-56. The Court described time-shifting as "the practice of recording ***a program*** to view it once at a later time." *Id.* at 423 (emphasis added); *see also id.* at 421 ("record[ing] ***a program*** [the consumer] cannot view as it is being televised . . . to watch it once at a later time" (emphasis added)). That description was consistent with how consumers normally used

---

[12] The technology has not been entirely absent, but has been limited to less prominent products like MythTV's open-source DVR software. *See* MythTV, *In Detail* (2012), http://www.mythtv.org/detail/mythtv (advertising "[c]ompletely automatic commercial detection/skipping").

VCRs at the time, how they normally use DVRs today, and how consumer time-shifting is normally understood—recording a specific program or series to watch it later.

Conventional time-shifting differs from other technologies consumers can use to watch television programs after they air.  Many cable companies offer "video on demand" ("VOD") services that permit consumers to watch previously aired television shows at a time of their choosing.  Unlike with a VCR or DVR, however, the consumer need not have made any prior decision to record the program.  *See Cablevision*, 536 F.3d at 125 ("[U]nlike a VOD service, RS-DVR users can only play content that they previously requested to be recorded."); Leslie Ellis, *Definitive Broadband: Next Generation* 130 (2005) ("[T]here is a relatively important distinction between VOD and DVR.  It is this:  With DVRs, consumers must first select a show, before it can be recorded and viewed later.  With VOD, the title can be retrieved at any time, without having to first select it.").  That ability to watch a show without having taken steps to record it is a significant distinction between video on demand and DVRs.  It is one reason a separate licensed market for video on demand exists:  Consumers are willing to pay for the convenience of watching television on demand without having to record a show beforehand.

By enabling consumers to mass record all prime-time programming and then decide what to watch later, Dish has created a system that functions like video on

23

demand in a way that VCRs and DVRs do not.  A consumer using PTAT need not make any prior decision to record a particular program.  The whole point of PTAT is to spare the consumer the need to make such decisions by indiscriminately mass-recording the entire prime-time block of programming.  PTAT allows a consumer to watch a show even if he had no desire at the time it aired to see it—indeed, even if he had ***not even heard of the show*** at the time.

That is precisely how Dish markets PTAT.  Dish touts the fact that PTAT allows consumers to watch prime-time programs "On Demand . . . without needing to schedule individual recordings."  Dish, *Equipment: Whole-Home Entertainment*, http://dishtv.com/Technology/Equipment.  "You used to have to spend time finding your shows [and] setting recording[s]," but PTAT "does the work for you."  Decl. of David Singer, *Fox Broad. Co. v. Dish Network LLC*, No. 2:12-cv-04529, ¶ 13 (C.D. Cal. filed Aug. 22, 2012) (docket #41-2) (quoting a Dish promotional video).  According to Dish, "[t]he magic of PrimeTime Anytime is that it allows DISH subscribers to catch up on all primetime shows, including episodes . . . recommended by friends, family, and co-workers ***after they've already been broadcast***."  Dish, *DISH Introduces Commercial-Free TV with "Auto Hop"* (May 10, 2012), http://about.dish.com/category/press-release-category/products-and-services (emphasis added).  Dish thus targets the very situations where PTAT ***least*** resembles conventional time-shifting: where the consumer has no specific plans to

24

record a show—or indeed has not even heard of the show—until *after* it airs. Dish markets PTAT, not as a conventional time-shifting system, but as television on demand—literally, "PrimeTime Anytime."[13]

PTAT thus functions like video on demand in a way that VCRs and DVRs do not. That fact is relevant to the fair use analysis because it bears on the potential harm to licensed markets—"undoubtedly the single most important" consideration. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985). By enabling consumers to mass copy all prime-time programming and decide what to watch later, Dish has created a system that competes directly with existing, licensed video-on-demand services.

### C.    The Court Should Find Dish Secondarily Liable

While there are strong arguments that AutoHop and PTAT each exceed the bounds of fair use individually, the combination leaves no doubt. Dish has created what amounts to a commercial-free video-on-demand service. The ability to watch commercial-free television at the time of one's choosing without recording anything in advance is highly desirable for consumers. That is why consumers pay for

---

[13] Dish argues that some high-end DVRs have such large hard drive capacity that consumers could program them to record the entire prime-time block, just like PTAT. But not everything one can do with a VCR or DVR is necessarily lawful. *Cf. Sony*, 464 U.S. at 423-24 & n.3, 442 (holding that time-shifting is fair use while reserving judgment on librarying). PTAT is designed for the *sole purpose* of mass copying.

commercial-free video-on-demand services such as Apple iTunes and Amazon Instant Video even if they can watch a show on regular television for free. Dish's system competes directly with those licensed services.

To be sure, where a consumer is recording a program for a noncommercial purpose, the content owner must "show[] by a preponderance of the evidence that *some* meaningful likelihood of future harm exists," and that potential harm must be "demonstrated," not merely "presumed." *Sony*, 464 U.S. at 451. But a plaintiff need only prove that a use would be harmful "if it should become widespread." *Id.* And the amount of evidence needed to prove a fact varies depending on the claim's inherent plausibility. *See Xiu Xia Lin v. Mukasey*, 534 F.3d 162, 167-68 (2d Cir. 2008); *cf. Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). Here, ABC has offered the reasonable judgments of its business executives that Dish's unlicensed, commercial-free video-on-demand service will hinder the development of alternative distribution channels. Whether that sort of evidence would sustain a finding of potential harm in a more doubtful case, it is sufficient here.

The district court held that the threat to licensed commercial-free video-on-demand services was irrelevant because "DISH *subscribers* are not offering a substitute market for a market that a copyright owner 'would in general develop or license others to develop,'" and "[t]he fact that *DISH* might be developing such a market does not defeat fair use pro[te]ction of copying by DISH's *subscribers*."

Dist. Ct. Op. at 16.  That makes no sense.  What matters for fair use is "the effect of the *use* upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4) (emphasis added).  It does not matter whether the party claiming fair use is a consumer or a producer in the unlicensed substitute market that is causing the damage.  Under the district court's reasoning, even consumers who downloaded copyrighted songs from blatant piracy sites could claim fair use because the *consumers* would not be offering any substitute market for lawful sales. That clearly is not the law.

Because ABC is likely to succeed on its claim that consumers have no fair-use right to mass copy all prime-time programming and play back programs commercial-free, it is also likely to succeed on its secondary liability claim against Dish.  The Supreme Court has recognized a number of secondary liability doctrines, including contributory infringement, vicarious infringement, and inducing infringement.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 935-36 (2005).  While the precise contours vary, those details are irrelevant in a case like this where a business markets a feature whose sole and intended purpose is to promote infringing conduct.  *See id.*

Accordingly, the district court should have issued a preliminary injunction. Reversing the decision on these grounds would ensure that secondary liability provides the protection Congress intended.  This Court need not distort the bounds

of direct infringement to provide redress.  What this Court said in *Cablevision* is equally true here:  "[T]o the extent that [a court] may construe the boundaries of direct liability more narrowly, the doctrine of contributory liability stands ready to provide adequate protection to copyrighted works."  536 F.3d at 132.

## **CONCLUSION**

The district court's direct infringement ruling should be affirmed, but its secondary liability ruling should be reversed.

Dated:  December 6, 2013            Respectfully submitted,

 /s/ Jeffrey A. Lamken
Jeffrey A. Lamken
Robert K. Kry
MOLOLAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000

*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

 X   this brief contains 6,953 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

____   this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

 X   this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font, or

____   this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

 /s/ Jeffrey A. Lamken  
Jeffrey A. Lamken